# EXHIBIT 39

## Page 1

IN THE UNITED STATES DISTRICT COURT
for the MIDDLE DISTRICT of PENNSYLVANIA

ELLEN GERHART, ELISE GERHART,  :
ALEX LOTORTO and ELIZABETH    :
GLUNT                          :
    Plaintiffs     : NO. 17-1726-YK
                :
    -VS-         :
                :
ENERGY TRANSFER PARTNERS,     :
L.P., et al.
    Defendants

* * * * *
THURSDAY, MAY 5, 2022
* * * * *

    Zoom Video Conferencing virtual remote
videotaped deposition of ROBERT RICE, taken pursuant
to notice, held in Raleigh, North Carolina on
Thursday, May 5, 2022, beginning at 10:07 a.m.,
before Susan L. Singlar, Professional Court Reporter
and Notary Public of the Commonwealth of
Pennsylvania, there being present.

    Any reproduction of this transcript is
prohibited without authorization by the certifying
agency.

KAPLAN, LEAMAN AND WOLFE
Registered Professional Reporters
230 South Broad Street, Suite 1303
Philadelphia, PA 19102
(215) 922-7112

## Page 2

```
 1   A P P E A R A N C E S :
 2
 3      WILLIAMS CEDAR LLC
        BY:   CHRISTOPHER MARKOS, ESQUIRE
 4        1515 Market Street, Suite 1300
          Philadelphia, Pennsylvania 19102
 5        (215) 557-0099
          Cmarkos@williamscedar.com
 6
          Representing the Plaintiffs
 7
 8
 9      LENGERT & RAIDERS LLC
        BY:  RICHARD A. RAIDERS, ESQUIRE
10        606 North 5th Street
          Reading, Pennsylvania 19601
11        (484) 509-2715
12        Rich@raiderslaw.com
          Representing the Plaintiffs
13
14      McNEES WALLACE & NURICK
        BY: STEPHANIE CARFLEY, ESQUIRE
15      BY: ALAN BOYNTON, ESQUIRE
          100 Pine Street
16        Harrisburg, Pennsylvania 17101
          (717) 581-3724
17        Scarfley@mcneeslaw.com
          Abitbtib@mcneeslaw.com
18
          Representing s Energy Transfer
19        Partners, L.P., Sunoco Pipeline, L.P.,
          Sunoco Logistics, L.P.,
20
21
22
23
24
```

## Page 3

```
 1      APPEARANCES (continued):
 2
 3      PENNSYLVANIA STATE POLICE
        ASSISTANT COUNSEL
 4      BY: JESSICA DAVIS, ESQUIRE
          1800 Elmerton Avenue
 5        Harrisburg, Pennsylvania 17100
          (717) 787-0388
 6        Jessicdavi@pa.gov
 7        Representing Trooper Dunsmore and Trooper
          Ehgartner and Trooper Benson
 8
 9
10      LAVERY LAW
        BY:  FRANK LAVERY, ESQUIRE
11        225 Market Street
          Harrisburg, Pennsylvania 17108
12        (717) 233-6633
          Flavery@laverylaw.com
13        Representing TigerSwan, LLC
14
15      SIANA, BELLWOAR & MCANDREW, LLP
        BY: CHRISTOPHER P. GERBER, ESQUIRE
16        941 Pottstown Pike Suite 200
          Chester Springs, Pennsylvania 19425
17        (610) 321-5500
          Cpgerber@sianalaw.com
18
          Representing Nick Johnson
19
20
        ALSO PRESENT:
21
22        CHRIS WEISS-CALHOON, Audio Visual Specialist
23
24
```

## Page 4

```
 1              I N D E X
 2
     WITNESS                      PAGE
 3
     ROBERT RICE
 4
       (Witness sworn.)             8
 5
 6     EXAMINATION by MR. MARKOS    8
 7
 8            E X H I B I T S
 9
10   NUMBER       DESCRIPTION        PAGE
11   Exhibit-1      Subpoena          15
12   Exhibit-2      Emails            25
13   Exhibit-3      TigerSwan Task Order/Assignment
                    Sheet             29
14
15   Exhibit-4    Black Badger Report    59
16   Exhibit-5    Various documents      63
17   REQUESTS FOR PRODUCTION:
18
19        (NONE)
20
21   DIRECTION TO WITNESS NOT TO ANSWER:
22   PAGE:  68   LINE:  14
23
24
```

1 (Pages 1 to 4)

Robert Rice

## Page 5

1    MS. WEISS-CALHOON:  We are on the
2  record.  My name is Chris Weiss-Calhoon,
3  certified legal videographer retained by On
4  The Record.
5      This is a video deposition in the
6  United States District Court for the Middle
7  District of Pennsylvania.  Today's date is
8  May 5th of 2022.  The time on the monitor is
9  10:07 a.m. Eastern Time.
10     The deposition is being held virtually
11  in the matter of Ellen Gerhart, et al versus
12  Energy Transfer Partners, et al.  The deponent
13  is Robert Rice for the record.
14     Will the attorneys please state their
15  appearance for the record?
16     MR. MARKOS:  Christopher Markos for the
17  plaintiffs.
18     MR. RAIDERS:  Rich Raider for the
19  plaintiff.
20     MR. LAVERY:  Frank Lavery for TigerSwan
21  and also representing the witness, Robert
22  Rice.
23     MS. CARFLEY:  Stephanie Carfley for
24  Sunoco Pipeline and Energy Transfer Partners.

## Page 6

1    MR. BOYNTON:  Alan Boynton, also for
2  Energy Transfer Partners and Sunoco Pipeline.
3    MS. DAVIS:  Jessica Davis for the
4  Pennsylvania State Police defendants,
5  Ehgartner and Dunsmore.
6    MS. WEISS-CALHOON:  And the court
7  reporter today is Susan Singlar of Kaplan
8  Lehman Wolfe and will now administer the oath.
9    THE COURT REPORTER:  Before I swear in
10  the witness, I will ask counsel to stipulate
11  on the record that the court reporter may
12  swear in the deponent, even though she is not
13  in the physical presence of the deponent, and
14  that there is no objection to that at this
15  time, nor will there be an objection to it at
16  a future date.
17     Christopher, can you stipulate to that,
18  please?
19     MR. MARKOS:  I do.
20     THE COURT REPORTER:  Richard?
21     MR. RAIDERS:  Yes, I do.
22     THE COURT REPORTER:  Stephanie?
23     Alan?
24     MR. BOYNTON:  I do.

## Page 7

1    THE COURT REPORTER:  We'll skip
2  Stephanie.
3    Jessica?
4    MS. CARFLEY:  Oh, I'm sorry.  I must
5  have been on mute.  I do.
6    THE COURT REPORTER:  Jessica?
7    MS. DAVIS:  I do.
8    THE COURT REPORTER:  Frank?
9    MR. LAVERY:  Yup, I do.
10     THE COURT REPORTER:  And Christopher?
11  Christopher Gerber?
12     MR. GERBER:  Yes, I'm fine.
13     THE COURT REPORTER:  And, counsel, can
14  you represent that to the best of your
15  knowledge and belief, the witness appearing
16  today via Zoom is, indeed, Robert Rice?
17  Mr. Lavery?
18     MR. LAVERY:  I stipulate to that.
19     THE COURT REPORTER:  Usual
20  stipulations?
21     MR. LAVERY:  That will be fine with the
22  exception that the witness will read and sign
23  the transcript when it's prepared.
24     * * * * *

## Page 8

1    ROBERT RICE, having been duly sworn,
2  was examined and testified as follows:
3      * * * * *
4      EXAMINATION
5      * * * * *
6  BY MR. MARKOS:
7    Q.   If you can't hear me, this goes for
8  everybody, just tell me to speak up.  I'll do by
9  best.  My voice is not a hundred percent.
10     Robert, thank you for being here today.
11  My name is Chris Markos.  I represent the plaintiffs
12  in the case that you are here to testify about.
13     Have you ever given a deposition
14  before?
15     A.   I have, yes.
16     Q.   Do you remember how recently?
17     A.   No, several years ago, between six and
18  ten, I think.
19     Q.   Was that the only time you've given a
20  deposition?
21     A.   I believe so, yes.
22     Q.   Okay.
23     Do you know what that case was about?
24     A.   It was personal related.

Robert Rice

## Page 9

1  Q.  Were you a party?
2  A.  Yes.
3  Q.  You said personnel or personal?
4  A.  Personal.
5  Q.  Okay.
6      Was the case in North Carolina?
7  A.  Yes.
8  Q.  Okay.  Even if you told me you had
9  given a deposition yesterday, I still go through
10 these ground rules with you because it makes sense to
11 be on the same page.
12     We are not face-to-face today but let's
13 do our best to act as if we were.  Being on Zoom has
14 its own particular set of considerations that we need
15 to take into account to make today go smoothly.
16 First and foremost is that we let each other finish
17 our respective questions and answers so that nobody
18 is talking over anybody else.  It's hard to have a
19 conversation that way usually, but especially when
20 you have Susan writing everything down.
21     Similarly, even though we can all see
22 each other, it's important that you verbalize your
23 responses, even if you're going to gesture with your
24 head to nod or shake your head; and similarly, that

## Page 10

1  you verbalize a word, rather than a sound like uh-huh
2  or an uh-uh because that's not clear enough of an
3  answer for the stenographer today or for the record
4  of this conversation.
5      Does that all make sense so far?
6  A.  Yes, it does.
7  Q.  If you can't understand a question,
8  either because my voice is soft or you just don't
9  understand the question, please tell me.  I'll do my
10 best to accommodate you.  If you answer the question,
11 it will be assumed that you understood it.
12     Okay?
13 A.  Understood.
14 Q.  I don't think we'll be all day.  Still,
15 if you need to take a break at any time, that's no
16 problem.  Only if I've asked you a question you will
17 finish your answer and then we can take a break.
18     Okay?
19 A.  Yes.
20 Q.  And, you know, as you know, this
21 deposition is being videotaped.  It's also being
22 transcribed.  You swore an oath.  You're testifying
23 today as if you were in court.
24     Do you understand that?

## Page 11

1  A.  Yes, I do.
2  Q.  Okay.
3      And that this transcript could one day
4  be used in this court case?
5      You understand that, as well?
6  A.  I do, yeah.
7  Q.  Okay.  I'll just do this as sort of a
8  preliminary thing.
9      I'll pull up -- do you see this
10 document?
11 A.  I do.
12 Q.  In the middle it says:  Subpoena to
13 testify?
14 A.  Yes.
15 Q.  All right.
16     Do you recall seeing this document
17 before?
18 A.  Without reading it, glancing at it,
19 this looks like what I received.
20 Q.  If you'd like to read it, please take
21 your time.
22 A.  Yeah.  I mean, this is what this looks
23 like.
24 Q.  Okay.

## Page 12

1      And just so you know, since I have --
2  I'm sharing clean documents with you.  I would love
3  for you to tell me if you need me to zoom in, zoom
4  out, scroll, whatever.
5      Okay?
6  A.  Okay.
7  Q.  Do you recall around when you received
8  this document?
9  A.  No, not offhand.  It's been at least a
10 month.
11 Q.  Okay.
12     What did you do after receiving this
13 document?
14 A.  I read it.  And I was -- I guess I was
15 a little stunned.  It was early in the morning.  I
16 tend to, you know, work late at night and I was a
17 little surprised by the knock at the door.
18     So I read it and put it down and I kind
19 of went back to bed.
20 Q.  Fair enough.  And I'm sorry.
21 Obviously, I have no control over the mechanics.
22     Did you talk to anybody after receiving
23 this document?  And just so you know, your
24 conversations with Frank and his firm are obviously

3 (Pages 9 to 12)

Robert Rice

| Page 13 |
| --- |

```
 1    privileged.  I'm not asking about that.
 2        A.   I talked to my wife.
 3        Q.   Okay.
 4             Did you talk to Nick Johnson?
 5        A.   Not -- not right away.  I did later.
 6        Q.   Okay.
 7             Did you talk to anybody at TigerSwan?
 8        A.   Not specifically.  I did call and
 9    advised them that I had received this.
10        Q.   Do you know who you called?
11        A.   I -- I -- give me a second.  I do.  I'm
12    just trying to remember his name.
13        Q.   Well, let me ask you a little
14    differently.
15             Did you call a specific person or did
16    you call, like, a general number?
17        A.   I called a specific person.  I'm
18    literally just blanking on the name at the moment.
19        Q.   We can come back to it.
20        A.   Okay.  That's fine.
21        Q.   And if you remember before I ask you,
22    you can just tell me.
23             Besides that phone call, have you
24    spoken to anybody at TigerSwan between receiving this
```

| Page 14 |
| --- |

```
 1    document and today --
 2        A.   I have not.
 3        Q.   -- about this -- about this case?
 4        A.   No.
 5        Q.   Okay.
 6             How many times did you talk to Nick
 7    Johnson after receiving this document?
 8        A.   I would say one time by phone and twice
 9    over text.
10        Q.   Okay.
11             What did you talk about?
12        A.   I wanted to know who the attorneys
13    were.
14        Q.   Is that it?
15        A.   Yes.
16        Q.   Okay.
17             Are you familiar with the Complaint in
18    this case?
19        A.   To a small degree, yes, but not in any
20    detail.
21        Q.   Have you reviewed any documents to
22    prepare for your deposition today?
23        A.   Yes.
24        Q.   Can you tell me what you looked at?
```

| Page 15 |
| --- |

```
 1        A.   It was several, I guess -- I'm not sure
 2    how to describe it.  It was with the attorneys.
 3        Q.   Okay.  That's fine.
 4             Did you talk to Kurt Merriweather
 5    between receiving this document and today?
 6        A.   No.  I have not.
 7        Q.   Okay.
 8             Do you know who that person is?
 9        A.   Yes.
10        Q.   How do you know him?
11        A.   I met him -- I'd have to estimate,
12    probably maybe ten years ago through a tech
13    conference.  We're both in the same industry.
14        Q.   You said "tech conference?"
15        A.   Yes, I did.
16        Q.   Okay.
17             Was that in North Carolina?
18        A.   Yes.
19             MR. MARKOS:  Just for the record, I'll
20    mark the Subpoena as Exhibit-1.
21    BY MR. MARKOS:
22        Q.   Do you see in the middle?
23        A.   Yes.
24        Q.   Let me know when you read that.
```

| Page 16 |
| --- |

```
 1        A.   I read it.
 2        Q.   Before receiving this document, or
 3    thereafter, did you make any effort to locate the
 4    documents described in that paragraph, that box?
 5        A.   I did to the extent that I thought I
 6    might have had any.
 7        Q.   Okay.
 8             And where did you look?
 9        A.   My -- my computer and email.
10        Q.   Okay.
11             Did you look through your phone?
12        A.   I'm sorry?
13        Q.   Did you look through your phone?
14        A.   No.  It's a new phone.
15        Q.   Okay.
16             New as of when?
17        A.   It's a -- it's a Pixel 6, so whenever
18    those came out, so I would guess within a year.
19        Q.   Okay.
20             Do you remember what phone you had in
21    2017?
22        A.   I've gone through -- I have no idea.  I
23    usually go through a phone every year.
24        Q.   And you don't save them or keep them?
```

**4 (Pages 13 to 16)**

Robert Rice

| Page 17 |
| --- |

```
1         A.   No.  There's no need to.
2         Q.   Okay.
3              Do you have the same computer that you
4    had in 2017?
5         A.   No.  I do not.
6         Q.   Okay.
7              Do you have a backup of files that you
8    would have worked on in 2017?
9         A.   In general for what I do in my personal
10   work, yes.
11        Q.   Yeah.
12        A.   For this, no.
13        Q.   Let me ask a question.
14             I mean, my understanding, tell me if
15   I'm correct, is that you spent some time working in
16   Tigerswan's office in Apex around 2017; is that
17   correct?
18        A.   That's correct.  Yeah.
19        Q.   And when you worked in the Apex office
20   there, did you use your own personal computer or a
21   TigerSwan device?
22        A.   TigerSwan device.
23        Q.   Okay.
24             Can you describe what it was, if it was
```

| Page 18 |
| --- |

```
1    a laptop or a desktop?
2         A.   A desktop.
3         Q.   Do you know what brand?
4         A.   No, no idea.
5         Q.   When you reached out to TigerSwan, did
6    you ask if they had any of the documents described on
7    this Subpoena?
8         A.   I did not.
9         Q.   Okay.
10             Did you find any documents?
11             You said you searched before, but did
12   you find anything?
13        A.   No.  I did not.
14        Q.   Is your position then that you have no
15   documents that would relate to what's described in
16   this Subpoena?
17        A.   That is correct.
18        Q.   Okay.
19             If you were working on a TigerSwan
20   device, did you have TigerSwan-issued credentials to
21   log into it?
22        A.   I'm sorry?
23        Q.   You said you worked on a -- you used a
24   TigerSwan-issued device when you worked in the Apex
```

| Page 19 |
| --- |

```
1    office.
2         A.   Yes.
3         Q.   Did they issue you credentials to log
4    into it?
5         A.   What do you mean by credentials?
6         Q.   Like, a user name and password.
7         A.   I don't recall being issued
8    credentials.  I think it was just -- I just kind of
9    started it up and I might have logged in on just my
10   own user name.
11        Q.   Okay.
12             Do you see a different document now?
13        A.   I do.
14        Q.   I have scrolled down to the top of page
15   DF TigerSwan 1939.  And I'm back up to the top.
16             Do you see where my cursor is?
17        A.   Yes.
18        Q.   You see where it says:  Two -- R2 at
19   TigerSwan?
20        A.   Yes.
21        Q.   Is that your email?
22        A.   At the -- now?  No.  At the time, yes.
23        Q.   That's what I meant.
24             Did you have any other at TigerSwan.com
```

| Page 20 |
| --- |

```
1    email address?
2         A.   I did, yes.  It's the same email but
3    this is actually the alias for the other one.  It's,
4    like, a forwarder.  So it's the same account but with
5    a different name.
6         Q.   When you say "alias," is that R2?
7         A.   Yes.
8         Q.   Right where I have highlighted?
9         A.   That's correct.
10        Q.   Okay.
11        A.   No.  No.  No.  I'm sorry.  I'm sorry.
12   No.  R2 at TigerSwan, that's like -- it's a
13   forwarding -- it's a forwarding alias to the actual
14   account.
15        Q.   The actual TigerSwan account?
16        A.   That's correct.
17        Q.   So what's the actual TigerSwan account?
18        A.   It was either R dot Rice or it was
19   Robert dot Rice at TigerSwan, if I remember
20   correctly.
21        Q.   I'm scrolling up to 1938.  If you know,
22   do you see where it says:  Nate Johnson?
23        A.   Yes.
24        Q.   And it says:  N Johnson at
```

Robert Rice

---

**Page 21**

1    TigerSwan.com?
2         A.    Yes.
3         Q.    Do you recall whether that was Nick
4    Johnson's email address?
5         A.    I believe so.
6               If I remember -- if I may answer your
7    previous question.
8         Q.    The one who you talked to at TigerSwan?
9         A.    Yes.
10        Q.    Yeah.
11        A.    I believe it was Shawn Sweeney.
12        Q.    Is there a reason you reached out to
13   him in particular?
14        A.    Somebody I know, I guess.
15        Q.    Is he the only person at TigerSwan you
16   still know?
17        A.    I do not know.  They have -- they have
18   had some personnel changes since I'm not -- not
19   associated with them.
20        Q.    Okay.
21              For what period of time are you doing
22   work in their Apex office, Tigerswan's Apex office?
23        A.    I don't remember, but it was certainly
24   during the time of these emails and then maybe before

---

**Page 22**

1    that for maybe a year-ish.  I was not -- I was not
2    employed there.  I was just kind of a contract
3    consultant so I came in as needed.
4         Q.    Yeah.
5               And then you said around the time of
6    these emails, maybe a year before.
7               What about after?  You see the date is
8    July 17, 2017.
9         A.    Yeah.  I honestly don't remember much
10   after I haven't been involved for -- for several
11   years now.  I have been working on other -- other
12   ventures.
13        Q.    Okay.  You said you came in as needed.
14              Is that what you just previously said?
15        A.    Yes.
16              MR. LAVERY:  Objection.  He said he
17   worked as a consultant and came in as needed.
18              MR. MARKOS:  Well, I was going to get
19   to that.
20   BY MR. MARKOS:
21        Q.    During the time while you were doing
22   consulting for TigerSwan, did you do that anywhere
23   else besides from within their Apex headquarters?
24              MR. LAVERY:  Object to form.

---

**Page 23**

1               Are you saying did he do it for
2    TigerSwan anywhere else or do it for anybody
3    at all anywhere else?
4               MR. MARKOS:  Yeah.  When he was --
5    BY MR. MARKOS:
6         Q.    You said he was doing consulting work
7    for TigerSwan.
8               Did you do that only in their office or
9    did you do consulting work for TigerSwan anywhere
10   else?
11              Does that make sense?
12        A.    Yes.  I did do work at other locations
13   for clients.
14        Q.    I'm only asking about your consulting
15   with TigerSwan.
16        A.    I'm trying to figure out how to answer
17   this clearly.  There were occasions where a TigerSwan
18   client would have work off site, so I would be
19   somewhere else, maybe another country, another, you
20   know, whatever.
21        Q.    All right.  I understand.
22              Did your off-site work ever take you to
23   Pennsylvania?
24        A.    One more time.

---

**Page 24**

1         Q.    Did that off-site work for TigerSwan
2    ever take you to Pennsylvania?
3         A.    One time, yes.
4         Q.    Do you remember when?
5         A.    I do not.
6         Q.    Do you remember why?
7         A.    Vaguely.  It had something to do with
8    doing a security assessment on a facility that was
9    having some issues.
10        Q.    Was it related to a pipeline?
11        A.    It was not.
12        Q.    Okay.
13              Was the client Energy Transfer
14   Partners, Sunoco Pipeline or Sunoco Logistics?
15        A.    I do not know who the client was but I
16   believe the facility was a Sunoco facility.
17        Q.    Okay.
18              Do you remember whether they were in
19   Pennsylvania?
20        A.    I have no clue.
21        Q.    Do you remember what year?
22        A.    I do not.
23        Q.    You -- you said you were consulting or
24   contracting with TigerSwan.  Just tell me again how

---

6 (Pages 21 to 24)

Robert Rice

Page 25

1  you describe it so I can use your term.
2      A.   The terms are interchangeable to me.
3      Q.   Okay.
4           Did you have a written agreement
5  pursuant to which you provided services to TigerSwan?
6      A.   I believe I did have consulting
7  agreement.
8      Q.   Do you still have a copy?
9      A.   I do not.
10     Q.   Do you recall the terms agreement?
11     A.   No.  I do not.
12          MR. LAVERY:  Object to form.  It's
13     overboard, too.  But he answered.
14  BY MR. MARKOS:
15     Q.   Was the agreement for a specific period
16  of time?
17     A.   No.
18     Q.   Did the agreement provide for how the
19  relationship could be terminated?
20     A.   I don't remember.
21     Q.   Back to this document.
22          Now do you see where my cursor is on
23  Monday, July 17th?
24     A.   Yes.

Page 26

1      Q.   There's a link to a WhatsApp chat?
2      A.   Okay.
3      Q.   Did you utilize WhatsApp for your work
4  with TigerSwan?
5      A.   I may have.  I used a variety of tools.
6      Q.   What other communication tools did you
7  use to perform your work?
8      A.   I don't remember specifically.
9      Q.   Did you have a personal cell phone that
10  you would use?
11     A.   I have had a personal cell phone since
12  personal cell phones have been around.
13     Q.   Bad question.  Fair enough.
14          Were you issued a cell phone by
15  TigerSwan with which to perform the work they were
16  asking you to do?
17     A.   No.  I was not.
18     Q.   Okay.
19          How did you meet Nick Johnson?
20     A.   He was a referral through Kurt
21  Merriweather.
22     Q.   Do you remember when Kurt Merriweather
23  facilitated your introduction to Nick Johnson?
24     A.   I do not.

Page 27

1      Q.   Do you recall if it was in or around
2  2016?
3      A.   I do not know.
4      Q.   Okay.
5           Before Kurt Merriweather introduced you
6  to Nick Johnson, did you know his name?
7      A.   No.
8      Q.   Did you know his work?
9      A.   No.  As I said, he was a referral.
10     Q.   Okay.
11          Did you request a referral from Kurt
12  Merriweather?
13     A.   Yes.
14     Q.   What did you ask Kurt Merriweather
15  exactly?
16     A.   I don't recall the specifics.
17     Q.   Was it in connection to the consulting
18  you were doing with TigerSwan?
19     A.   Yes.
20     Q.   Do you remember not so much the work
21  but, like, the type of candidate you were asking for
22  him to refer you to?
23     A.   I was looking for somebody that was
24  familiar with -- with overall web development, video

Page 28

1  production, social media, pretty much web 2.0
2  technologies.
3      Q.   At some point Kurt introduced you to
4  Nick Johnson?
5      A.   Yes.
6      Q.   And did you come to be satisfied that
7  he had those qualifications that you were looking
8  for?
9      A.   I assume so, yes.
10     Q.   And how did you make that
11  determination?
12     A.   I don't remember in this specific case.
13     Q.   What did you tell Nick Johnson about
14  the kind of work that you do?
15     A.   I don't remember specifically.
16     Q.   Did you tell Nick Johnson who he would
17  be doing the work for?
18     A.   I don't remember the specifics of the
19  details of the conversation.  It's been several
20  years.
21          MR. LAVERY:  Chris, could you just
22     indicate what the document is, either by Bates
23     number or exhibit number just so we know?  I
24     mean, obviously, we know what it is.  I can

7 (Pages 25 to 28)

Robert Rice

Page 29

1    see it on the screen, but just so the record's
2    clear.
3          MR. MARKOS:  No.  I know, Frank.  And
4    I'm trying to write it down because if I don't
5    I'll forget it.
6          MR. LAVERY:  That's why I'm asking you
7    because I will, too.
8          MR. MARKOS:  This is a set of documents
9    Bates stamped Cedar Fork 1 through 29.
10         THE COURT REPORTER:  Christopher?
11         MR. MARKOS:  Yes.
12         THE COURT REPORTER:  Did you want to
13   mark what you showed previously?  I don't
14   remember what we were on.  It was an email, I
15   think.
16         MR. MARKOS:  Yeah.  So I showed the
17   Subpoena and that will be Exhibit-1.  I showed
18   a set of emails.  That will be Exhibit-2.  And
19   then this document will be Exhibit-3.
20         THE COURT REPORTER:  Thank you.
21         MR. MARKOS:  And I'm writing it down so
22   I don't forget.
23   BY MR. MARKOS:
24       Q.   Robert, have you seen this document

Page 30

1    before?
2        A.   I believe so, yes.
3        Q.   Okay.
4             Your name is on it; correct?
5        A.   Yes.
6        Q.   You were going to say something.  Go
7    ahead.
8        A.   No.  That's fine.
9        Q.   What does project manager mean?
10       A.   It means project manager, someone who
11   manages a project.
12       Q.   What project were you managing?
13       A.   At this specific time?
14            Can you be more -- can you be more
15   specific in your question?
16       Q.   The document says:  Robert Rice,
17   project manager.
18            If you know the project you were
19   managing that the document identifies you as project
20   manager for is the question I'm asking.
21       A.   Oh, no.  I did not have a -- a specific
22   title.  So this -- whoever wrote this document just
23   put that in there.  In terms of specific projects, I
24   handled a variety of projects, so this could be

Page 31

1    anything.  It's just a general -- it just says:
2    Report to Robert Rice, project manager.
3        Q.   Can you tell me what the differences
4    between a project manager and a program manager is?
5        A.   In the context of my understanding of
6    these terms in general industry parlance, project
7    manager is something specific, i.e., a project, like,
8    dig a ditch.  Whereas, a program manager would be
9    something broader, like, build a building that might
10   have a ditch.
11       Q.   Okay.
12            To the left of your name it says:
13   Reports to.
14            Did Kurt Merriweather report to you
15   during the duration of this agreement?
16       A.   No.
17       Q.   Did Nick Johnson?
18       A.   He sort of.
19       Q.   Can you explain what you mean by "sort
20   of?"
21       A.   Yeah.  It was not a -- direct report
22   sort of relationship.  It was more of a collegiate or
23   a collaborative.
24       Q.   I think understand.

Page 32

1          MR. LAVERY:  Can we just clarify
2    whether this project, which we haven't named
3    at this point, although I think we have some
4    instructions from a judge on it and the names
5    on there, was -- was not Mariner East 2 just
6    so there's no confusion on the record?  Or if
7    you can ask him that question, one or the
8    other.
9          MR. MARKOS:  You know, I'm trying to be
10   careful about it.
11         MR. LAVERY:  No.  And I certainly
12   appreciate that.  And that's why I am, too.
13   I'm not even bringing up the name of it, but
14   it looks like it relates to another project.
15   I mean, you can certainly ask him if this also
16   related, you know, to Mariner 2.  That's
17   within your province to do that.  But I just
18   want to make sure the record is clear so
19   there's no implication that this is a Mariner
20   2 contract.
21         MR. MARKOS:  Yeah.
22   BY MR. MARKOS:
23       Q.   So do you get a lot of reports to you
24   that says:  Contract name, Robert?

8 (Pages 29 to 32)

Robert Rice

Page 33

1    A.   Yes.
2    Q.   And the contract name is DAPL
3  Information Operations.
4         Was this the only project you were
5  working on with TigerSwan in -- in 2016?
6    A.   I don't remember.  I may have worked on
7  other projects.
8    Q.   Okay.
9         Did you do any work related to the
10  Mariner East 2 pipeline in Pennsylvania pursuant to a
11  contract named DAPL Information Operations?
12   A.   No.  I did not.
13   Q.   Did you do any work pertaining to the
14  Mariner East 2 pipeline in Pennsylvania pursuant to
15  your consulting work with TigerSwan?
16   A.   No.  I did not.
17   Q.   This is Cedar Fork 3.  And there's a
18  bunch of these.  I'm just going to show you this one
19  in particular.  This is an invoice that Nick Johnson
20  submitted.
21        Have you ever seen this before?
22   A.   Yes.
23   Q.   Okay.
24        When did you see it?

Page 34

1    A.   In context of the attorney meeting.
2    Q.   Okay.
3         Was this -- what I was really trying to
4  ask you is:  Was this invoice submitted to you for
5  approval for payment back when it was written?
6    A.   My first time seeing this document was
7  in conversation with the attorneys.
8    Q.   Okay.
9         Did you also connect Kurt Merriweather
10  to TigerSwan?
11   A.   Can you be specific about what you mean
12  by connect?
13   Q.   Did you make the introduction?
14   A.   Not directly.
15   Q.   Were you working with other people
16  around 2016 who knew Kurt Merriweather at TigerSwan?
17   A.   I'm not -- not quite sure what -- what
18  you're asking.  I'm trying to be specific in my
19  answers.  If you will allow me to go back a second
20  and maybe rephrase.
21   Q.   All right.
22   A.   So Kurt was somebody that I knew and
23  was, as I mentioned earlier, kind of the referral
24  source to Nick.  So my -- at the time I was looking

Page 35

1  for somebody to help me, so that was Nick.
2         So I don't recall a specific
3  hello-TigerSwan-this-is-Kurt sort of conversation.
4  But I'm sure he would have, you know, had at least a
5  conversation somewhere around there.  I mean, he --
6  he wasn't really involved in any of this.  So as to
7  whether or not somebody else knew him in some other
8  context, you know, I have -- I have no insight to
9  that.
10   Q.   Perfectly fair.
11        Let me ask you, if you know, you said
12  you were, you know, a direct independent contractor
13  with TigerSwan, right?
14   A.   I said I was a consultant or a
15  contractor, yes.
16   Q.   But you had an agreement directly with
17  them, not through any intermediary, right?
18   A.   That's correct.
19   Q.   Okay.
20        Do you know why if you brought Nick
21  Johnson on to help you with your work you were doing
22  for TigerSwan, why TigerSwan wouldn't have made an
23  agreement directly with him the same way you had it?
24   A.   I can't speculate for -- for

Page 36

1  Tigerswan's intentions.
2    Q.   Fair enough.
3         And going back to 2016 and 2017, I'm
4  assuming you would have known Shawn Sweeney at
5  TigerSwan?
6    A.   I'm sorry.  I could not hear you.
7    Q.   I'm assuming you would have known Shawn
8  Sweeney at TigerSwan?
9    A.   Yes.
10   Q.   Did you also know Derrick Borror?
11   A.   I couldn't hear you.
12   Q.   Derrick Borror?
13   A.   Yes.
14   Q.   Jim Reese?
15   A.   Yes.
16   Q.   What about Nick McKinnon?
17   A.   I know the name but I don't recall
18  meeting them face-to-face.
19   Q.   Al Ornoski?
20   A.   I'm sorry?
21   Q.   Al Ornoski?
22   A.   I don't remember.
23   Q.   John Porter?
24   A.   Never met.

Robert Rice

Page 37

1    Q.   Chad McGinty?
2    A.   Never heard of.
3    Q.   Brian Smith?
4    A.   Familiar; don't recall much
5  interaction.
6    Q.   What TigerSwan employees did you
7  primarily interact with in 2016 and 2017?
8    A.   It would have been, as you said, Shawn
9  Sweeney, Derrick Borror, Jim Reese, obviously. There
10 was two people in the HR payroll. It was Heidi --
11 no, not Heidi, Hailey, and Cheryl, maybe. And there
12 might have been maybe one or two other people through
13 the office that I might have seen in passing in the
14 hallway or I might have chatted with.
15   Q.   How big was the office?
16   A.   I have no idea.
17   Q.   Well, do you know how many office space
18 there are?
19   A.   I also have no idea. It's been several
20 years since I have been there.
21   Q.   Did you have a dedicated office space
22 or a desk space?
23   A.   There was an area in the corner of an
24 open -- of an open area, like -- kind of like a

Page 38

1  hallway where I had a desk, yes, but I didn't have a
2  specific office.
3    Q.   Are you familiar with a Facebook page
4  called PA Progress?
5    A.   I am peripherally familiar with it,
6  yes.
7    Q.   You say "peripherally?"
8    A.   Yes.
9    Q.   How did you become familiar with it?
10   A.   It would have come up in conversation
11 at the time but it's not something that I spent any
12 time either contributing to or being involved in, so
13 peripherally aware.
14   Q.   Who did you have conversations about it
15 with?
16   A.   It would have been Nick.
17   Q.   Did you have conversations about it
18 with Kurt Merriweather?
19   A.   I do not recall, no.
20   Q.   Any of the TigerSwan names we just went
21 through?
22   A.   No.
23   Q.   What did you talk about with Nick about
24 PA Progress?

Page 39

1    A.   I don't remember. I would speculate
2  that it would have just been a hey, what are you up
3  to, what are you working on, or hey, this is funny
4  sort of conversation.
5    Q.   Are you familiar with a website called
6  Black Badger Report?
7    A.   I am familiar with the domain name.
8    Q.   Meaning just BlackBadgerReport.com and
9  nothing else?
10   A.   Yes.
11   Q.   Okay.
12        How did you become aware of the fact
13 that that domain name existed?
14   A.   I don't remember but I believe that
15 domain was one of many that I had owned at the time
16 and I might have made it available.
17   Q.   Who did you make it available to?
18   A.   It would have -- it would have just
19 been Nick, basically.
20   Q.   Okay.
21        If I understand you correctly, you
22 never posted any content onto BlackBadgerReport.com
23 URL?
24   A.   I may have if I was, you know, setting

Page 40

1  it up or configuring on the server side or even --
2  even the front end.
3    Q.   I just don't know.
4        What's front end?
5    A.   Oh, in this -- this context, the front
6  end would be the -- the -- the framework for the
7  website, you know, kind of like WordPress or
8  Squarespace or something along those lines.
9    Q.   Not the name of a user like a web
10 browser would see, somebody like me surfing the
11 internet?
12   A.   Correct. Yes.
13   Q.   And then, just so I understand, you
14 didn't -- you don't think you would have posted
15 anything on BlackBadgerReport.com that an internet
16 user would see if they went to the website?
17        MR. LAVERY: I mean, you can only tell
18 him what you remember.
19        I mean, do you remember anything like
20 that?
21        THE WITNESS: I do not remember making
22 any posts or content. I may have -- at least
23 I don't remember. I may have also done other
24 things like header graphics or, you know,

Robert Rice

Page 41

1  like, setting up a WordPress sort of think.
2  So yeah.  I probably would have stuck a
3  copyright thing down at the bottom, basic
4  stuff.  So I mean, that -- that is considered
5  content, as well in this industry.  So I'm
6  trying to -- I'm trying to answer and be
7  specific.
8  BY MR. MARKOS:
9      Q.    That's fair enough.
10          When you say "industry," are you
11  talking just tech in general?
12     A.    Yes.
13     Q.    Okay.
14          During the period of time that we've
15  been talking about, '16 and '17, you were working on
16  social media typically, right?
17     A.    I'm sorry?
18     Q.    During the time period we've been
19  talking about today, 2016 and '17, you were doing
20  work specifically in social media; is that fair?
21     MR. LAVERY:  I'm just going to object.
22          Are you asking him is that all -- is
23     that the majority, is that all of his work,
24     did he do other work?  I'm just trying to get

Page 42

1  a clear record.  I'm not trying to bust your
2  stones.  I just want to get a clear record on
3  that.
4      MR. MARKOS:  Yeah.  We're not even
5  there yet; if that was part of what his work
6  entailed at that period of time.  We can
7  narrow it down then.
8      THE WITNESS:  During that time I did do
9  work related to social media.
10  By MR. MARKOS:
11     Q.    Okay.
12          Did you use any aliases doing that
13  work?
14     A.    Yeah.  I -- I'm pretty sure I did.  I
15  mean, even for my own personal stuff I used aliases.
16  It's not -- it's not common for people to have their
17  full, you know, name and address in there, you know,
18  Twitter ID or their -- you know, even an email
19  account.  I mean -- so yeah.  Sure.
20     Q.    Do you remember what aliases you used
21  during that period of time?
22     A.    I have no idea.
23     Q.    Alan Rice?
24     A.    Probably.

Page 43

1      Q.    Okay.  This was previously marked as
2  Exhibit-2 to Nick Johnson's deposition.
3          Do you see question number four?  I can
4  make it bigger if you need.
5      A.    A little bigger would be helpful.
6      Q.    Sure.
7      A.    Thank you.
8          And which one were you asking about?
9      Q.    Number four.
10     A.    Number four.  Yes.
11     Q.    Do you see the response?
12     A.    Yes.
13     Q.    Okay.
14          Were you an author of content for a PA
15  Progress Facebook page?
16     A.    I may have been.  I don't recall.  Let
17  me be specific about that.  I may have been for Black
18  Badger Report but I don't recall being involved in PA
19  Progress.
20     Q.    Okay.
21          Do you see -- I'm now looking at number
22  five right below.
23     A.    Okay.
24     Q.    And you are identified as creator of a

Page 44

1  video posted to the PA Progress Facebook page.
2          Do you see that?
3      MR. LAVERY:  Object to the form of the
4  question.  It asks -- it doesn't say anything
5  about being a creator.  It says:  Identify all
6  individuals involved in the making of any
7  videos posted to the PA Progress Facebook
8  page.  That's the question.
9  BY MR. MARKOS:
10     Q.    It said you were involved in the making
11  of a video posted to the PA Progress Facebook page,
12  one or more videos.
13     A.    That's not what it says.
14     Q.    Well, any videos.
15          Were you involved in making any videos
16  posted to the PA Progress Facebook page?
17     A.    I do not recall being involved in
18  making any videos that were posted to the PA Progress
19  Facebook page.
20     Q.    Do you know who Roberto Bricchi is?
21     A.    I'm not familiar with the name, no.
22     Q.    Give me a sec.  Sorry.
23          While I'm looking for that, are you
24  familiar with a Facebook page called Green

Robert Rice

## Page 45

1  Libertarian Unity?
2      A.    Green Libertarian Unity?  No.  I am
3  not.
4      Q.    That's what I said, yeah.  Okay.  I'm
5  going to show what was previously marked as Exhibit-9
6  for Nick Johnson's deposition.  You'll have to walk
7  me through -- I'm scrolling through it.  Tell me when
8  you want me to go down.
9            My question is:  Have you seen this
10  before?
11      A.    Yes.
12      Q.    And have you seen it before the year
13  2022?
14      A.    No, not that I'm aware of.
15      Q.    Okay.
16            Have you seen any of the images
17  separate from the rest of the document before?
18      A.    I don't believe so.
19      Q.    You know, I should have probably asked
20  you a little more before.
21            Can you tell me what exactly is your,
22  like, work background?
23      A.    I have a varied background.  I would
24  characterize myself as a -- an industry expert in

## Page 46

1  terms of interactive media; 3D graphics; web
2  technologies; augmented reality; virtual reality;
3  simulations; virtual worlds; live in a blockchain;
4  some cyber security, as well as, you know, things of
5  that -- that nature, games, whatnot.
6      Q.    Let's see if this works.
7            Do you see this website?
8      A.    Yes.
9      Q.    Okay.
10            Can you hear that:  Hey guys?
11      A.    Yes.
12      Q.    Okay.
13            * * * * *
14            (Whereupon, 12 seconds of a video clip
15  was played.)
16            * * * * *
17  BY MR. MARKOS:
18      Q.    It's about 12 seconds into that video
19  now.
20            Now going to -- have you seen this
21  video before?
22      A.    Yes.
23      Q.    Okay.
24            Have you seen the video before 2022?

## Page 47

1      A.    Yes.
2      Q.    How did you come to see the video?
3      A.    I don't remember.
4      Q.    Do you remember if you found it on your
5  own or if it was shared with you?
6      A.    I don't remember.  It -- yeah.  I don't
7  remember.
8      Q.    Did you contribute to the production of
9  this video?
10      A.    No.  I did not.
11      Q.    Have you seen the person in this video
12  before, outside of seeing it in a video on the
13  internet?
14      A.    No.
15            * * * * *
16            (Whereupon, six seconds of a video clip
17  was played.)
18            * * * * *
19  BY MR. MARKOS:
20      Q.    Have you seen that video before?
21      A.    Yes.
22      Q.    Do you remember when you saw it?
23      A.    No.
24      Q.    Do you remember how you came to see it?

## Page 48

1      A.    Nope.
2      Q.    He said he was reporting for Louisiana
3  First.
4            Are you familiar with the Facebook page
5  Louisiana First?
6      A.    No.  I am not.
7            THE COURT REPORTER:  Christopher?
8            MR. MARKOS:  Yeah?
9            THE COURT REPORTER:  When you play the
10  videos, do you want me to write down what the
11  person's saying or just put a parenthetical
12  that it was played?
13            MR. MARKOS:  You can put a
14  parenthetical that 12 seconds of the first one
15  and six seconds of the second one.  That's
16  fine.
17            THE COURT REPORTER:  Okay.  Thank you.
18            MR. MARKOS:  Would you like me to
19  dictate the URL?
20            THE COURT REPORTER:  Whatever you want
21  to do to identify it.
22            MR. MARKOS:  Okay.  I'll identify it,
23  other than read it to you.  Theintercept.com,
24  Backslash, 2017, backslash, 08, backslash, 26,

12 (Pages 45 to 48)

Robert Rice

Page 49

1  backslash, DAPL, hyphen, security, hyphen,
2  firm, hyphen, TigerSwan, hyphen, respondent,
3  hyphen, two, hyphen, pipeline, hyphen,
4  vandalism, hyphen, by, hyphen, launching,
5  hyphen, multi state, hyphen, dragnet. I
6  didn't write the title.
7  BY MR. MARKOS:
8      Q.   So I was asking you about your work
9  history.
10         Do you remember in 2017, let's say, did
11 you have any employers other than your consulting job
12 with TigerSwan?
13         MR. LAVERY: Object to the form of the
14 question.
15         But you can answer.
16         THE WITNESS: I believe so. I mean, I
17 did a variety of contract consulting work and
18 I also was working on my own company in
19 startup.
20 BY MR. MARKOS:
21     Q.   Did you have one or more than one
22 company that you had control over that you worked
23 for?
24     A.   I don't recall but at the time it

Page 50

1  probably would have been just one.
2      Q.   Okay. This is a website called, I
3  guess, psychopaths in charge.  K Young 4,
4  WordPress.com, backslash, 2017, backslash, 07,
5  backslash, 12, backslash, The Bridge With Kira Live
6  from Camp White Pine, hyphens between all of the
7  words.
8          Have you seen this website before,
9  Robert?
10     A.   I do not believe so, no.
11     Q.   The video on the website, I'm going to
12 play a second of it.
13              * * * * *
14         (Whereupon, 45 seconds of a video clip
15 was played.)
16              * * * * *
17         MR. MARKOS: Susan, note I jumped to
18 about 6:15 and played about 45 seconds of the
19 video.
20         MR. LAVERY: Yeah. I think you played
21 it until about 6:42, I think, Chris.
22         MR. MARKOS: It says:  6:58.
23         MR. LAVERY: All right. I just saw
24 6:42 when you ended it. But either way,

Page 51

1  either one is fine by me.
2  BY MR. MARKOS:
3      Q.   And then below it it says: In a
4  talking circle style interview, Kira talks to Camp
5  White Pine activists.
6          I know it's a long way of asking a
7  simple question, but if you recall, did you listen to
8  or watch this video before, Robert?
9      A.   I do not believe so. This is the first
10 time for me.
11     Q.   You said that you got Nick involved to
12 help you in what you were doing, right, Nick Johnson?
13     A.   I -- I -- I believe that's what I said.
14     Q.   Yeah.
15         And you said it was an egalitarian kind
16 of sharing of the workload; fair?
17     A.   I don't recall saying the word
18 egalitarian.
19     Q.   No. You didn't say that. But you said
20 it wasn't like -- he wasn't reporting to you.
21         You weren't watching over his shoulder
22 and supervising him; is that fair?
23     A.   In general, yes.
24     Q.   Okay.

Page 52

1          Was there somebody at TigerSwan who was
2  supervising whatever work Nick Johnson was doing?
3      A.   No. In most context, if there was a
4  need for any supervise or anything it would have been
5  me. But as I said, our relationship was fairly
6  casual.
7      Q.   Sure.
8          What about, you know, assigning work?
9          How would Nick Johnson be assigned
10 work?
11         MR. LAVERY: Object to form without
12 foundation.
13         But go ahead. You can answer.
14         THE WITNESS: In the normal course of
15 our working relationship we would sit and
16 discuss things that may need to be done or a
17 direction that we thought things may need to
18 go or, you know, it was sort of self tasking
19 to some degree. You know, if I -- for
20 example, if I needed to get a ditch dug and we
21 were, you know, discussing about the ditch,
22 you know, I might volunteer to grab a shovel
23 and dig on the left and he might volunteer to
24 grab a wheelbarrow or he may just kind of go

13 (Pages 49 to 52)

Robert Rice

Page 53

1    off on his own and grab a shovel and start
2    digging the ditch from the other side.
3        So it wasn't, like, a normal, you know,
4    work environment where somebody walks in with,
5    you know, a great big list of tasks in a
6    highly managed sort of environment where we
7    have very specific things to get done, if
8    that -- if that makes any sense.
9  BY MR. MARKOS:
10   Q.   I think it does.
11       So using your metaphor, you know, of
12   digging a ditch and building a house, as a consultant
13   with TigerSwan, was the house being built for either
14   Energy Transfer Partners, Sunoco Pipeline or Sunoco
15   Logistics?
16           MR. LAVERY:  Object to form.
17           You can answer.
18           THE WITNESS:  Can you be more specific?
19   You asked about several different things
20   there.
21  BY MR. MARKOS:
22   Q.   Great.  So I'm asking about three
23   related entities, Energy Transfer Partners, Sunoco
24   Pipeline, Sunoco Logistics.

Page 54

1        Okay?
2        Using the metaphor you used earlier of
3    digging a ditch versus building a house, as a
4    consultant at TigerSwan, was the house that you were
5    working on for those entities?
6           MR. LAVERY:  Object to form.
7           You can answer.
8           THE WITNESS:  I believe I stated
9    earlier that I did not work on anything
10   related to the ME2 pipeline.
11  BY MR. MARKOS:
12   Q.   Yes, but that wasn't what I asked you.
13   A.   Okay.
14           MR. LAVERY:  Just so I can understand
15   the record at this point, you're just asking
16   him in general?
17           MR. MARKOS:  I am.
18           MR. LAVERY:  With all projects that he
19   did with TigerSwan?
20           This is not focusing on ME2 because he
21   said he gave no direction or supervision on
22   ME2.
23           So am I correct on that?
24           MR. MARKOS:  Yes, Frank.

Page 55

1           MR. LAVERY:  Okay.
2           Go ahead.  You can answer then, Robert.
3           THE WITNESS:  As shown on the previous
4    documentation you shared, I was involved in
5    another project underneath or that was related
6    to Energy Transfer.
7  BY MR. MARKOS:
8    Q.   Right.
9        And that project referenced the Dakota
10   Access Pipeline, right?
11   A.   Yes.
12   Q.   Did you work on any other projects that
13   were either Energy Transfer or Sunoco projects during
14   your time with TigerSwan?
15   A.   Other than the other one that I
16   mentioned where I did the security review for a
17   facility?
18   Q.   Yes.
19   A.   The answer's no.
20   Q.   Okay.
21       Was it a cyber security or, like, a
22   physical -- something other physical location?
23   A.   It was a little of both and more
24   physical.

Page 56

1    Q.   Okay.
2        You were still an independent
3    contractor or consultant during TigerSwan in July of
4    '17; would you agree with that?
5    A.   That sounds about right.  I don't
6    recall the last time that I did work there so . . .
7    Q.   Okay.
8        Do you recall if you were still working
9    there in August of '17?
10   A.   I have no idea.
11           MR. LAVERY:  I'm sorry.  I just object
12   to the form.  I'm sorry.
13  BY MR. MARKOS:
14   Q.   When you -- during the course of your
15   consulting work for TigerSwan, did they pay you
16   directly or did they pay you, you know, a company that
17   you controlled?
18   A.   I think they always paid me directly.
19   Q.   Okay.
20       So would you be able to look at your
21   payment records and determine when you stopped being
22   paid by TigerSwan?
23   A.   I wasn't paid on a regular basis, like,
24   somebody would be on, like, salary or something.  So

14 (Pages 53 to 56)

Robert Rice

Page 57

1  I'd have to figure out when the last time was that I
2  did work that they would have paid me for, and I
3  don't know when that is and I don't know how far back
4  I could maybe find bank records for, so I don't know.
5      Q.   Fair.
6           If you were an independent contractor
7  in 2017 you would have filed a 1099, right?
8      A.   Yeah.
9      Q.   Do you maintain your tax records going
10 back to 2017?
11     A.   I do not.  I have an accountant that
12 does.
13     Q.   Who is your accountant?
14          MR. LAVERY:  I don't think he has to
15 give -- you don't have to give them your
16 personal accountant.  I mean, if you want
17 records from his accountant, Chris, related
18 specifically to this subject, get me a request
19 and I'll work with -- I'll work with him on
20 it.  But he's not disclosing his personal
21 accountant.
22          MR. MARKOS:  That's fine, Frank.
23          MR. LAVERY:  I know.  But seriously,
24 I'm not trying to obstruct you.  If you give

Page 58

1  me a proper request for it, I will get it for
2  you.
3          MR. MARKOS:  Sure.  I don't know what
4  else to ask for besides his 1099s from 2017.
5          MR. LAVERY:  Yeah.  I know.  I'd ask
6  him the same thing if I were you.  That's
7  fine.
8          MR. MARKOS:  Okay.
9  BY MR. MARKOS:
10     Q.   (Inaudible)
11     A.   I can't hear you.
12     Q.   Can you hear me now?
13     A.   Yes.
14          MR. LAVERY:  I think it's when you move
15 back or away from whatever the microphone
16 source is that's a problem.
17          MR. MARKOS:  This computer has two,
18 quote, unquote 360 degree microphones.
19          MR. LAVERY:  Good luck with that.
20          MR. MARKOS:  But you guys tell me all
21 the time that you can't hear me, so I don't
22 know.  I'm going to blame the technology.
23          MR. LAVERY:  I can hear you fine.  As
24 long as you're, like, right there, I can hear

Page 59

1  you fine.  It's when you kind of move a little
2  bit, that's the problem.
3          MR. MARKOS:  Yeah.
4  BY MR. MARKOS:
5      Q.   You said you had some conversations
6  with Nick Johnson and he mentioned PA Progress,
7  right?
8      A.   When?
9      Q.   At some point.
10     A.   I'm sure, yeah.
11     Q.   Yeah.
12          Did he say that he was working on that
13 at all, that he was working on that?
14     A.   I'm sure he did.
15     Q.   Did he say if he was working with
16 anybody else?
17     A.   What do you mean?
18     Q.   Like, if anybody else was helping him
19 on that Facebook page.
20     A.   I'm not aware of anybody else that
21 would have been working on that.
22          MR. MARKOS:  This will be Exhibit-4.  I
23 don't think it's Bates stamped.  It might have
24 been but I don't have the one that is.

Page 60

1          MR. LAVERY:  It's been produced -- it's
2  been produced in the case, though?
3          MR. MARKOS:  I'm pretty sure it's in
4  our initial disclosures, Frank.
5          MR. LAVERY:  It could have been.  I
6  just have so much stuff in this case that it's
7  hard to keep track of it all.  Okay.
8          MR. MARKOS:  You know what?  Give me a
9  second.  I'll make sure.  If I can find the
10 Bates stamp, I'm happy to provide it.
11          MR. LAVERY:  I'm not doubting you,
12 Chris.  I'm just saying I don't specifically
13 remember it.  But if you tell me it was, then
14 I believe you.
15 BY MR. MARKOS:
16     Q.   Back to it.  It's a PDF.  It's not a
17 website.  This is the second page of the document.
18          Do you see these images and words,
19 Robert?
20     A.   Yes.
21     Q.   Okay.
22          So looking at what you can see right
23 now, does this refresh your recollection one way or
24 the other if you had any involvement in the three

Robert Rice

Page 61

1   links at the top of this page?
2       A.   What are the links?
3       Q.   Okay.
4           You have report, Russian -- Russian
5   funding environmental activist groups to shake up
6   American energy markets, report, The Intercept is
7   connected to communist groups, report, water
8   protector leaks details on shocking camp life.
9       A.   Okay.
10          So you're referring to these as
11  articles?  Oh, I see.  So when you hoover over it I
12  can see the links.  Okay.  I'm sorry.
13          But would you repeat the question?  I
14  understand what you're talking about.
15      Q.   So what we're looking at right now,
16  does this refresh your recollection one way or the
17  other whether you may have worked on any of these
18  three links?
19      A.   These look familiar but I don't recall
20  working on either of these links or -- or
21  contributing to writing.
22      Q.   The same question for the next three
23  here.
24      A.   The same as before.

Page 62

1       Q.   Okay.  What I just put up is Bates
2   stamped Gerhart 88 to 125.
3           MR. LAVERY:  I'm sorry.
4           Can you give me that again, the
5   numbers.
6           MR. MARKOS:  88 to 125.
7           MR. LAVERY:  Okay.
8           MR. MARKOS:  This was definitely part
9   of our initial disclosures because that's
10  where I found it.
11  BY MR. MARKOS:
12      Q.   Okay.  I'm going to ask you some
13  questions, Robert, just like I asked before, if you
14  have any recollection of creating or contributing to
15  posts on PA Progress.
16          So do you see this link to the video
17  that we looked at before?
18      A.   Yes.
19      Q.   Okay.
20          There's a caption above it, PA Progress
21  added a video?
22      A.   Uh-huh.  Yes.
23      Q.   Any recollection one way or the other
24  if you had any involvement in this posting to

Page 63

1   5Facebook?
2       A.   I did not.
3       Q.   All right.  Back to Gerhart 97 -- 99,
4   the same question.
5           Any recollection if you had any help in
6   creating or posting this?
7       A.   I did not.
8       Q.   You did not or you don't recall?
9       A.   No.  I did not contribute or post or .
10  . .
11      Q.   This one is long so I can scroll and
12  you tell me, but the same question.
13      A.   I did not.
14      Q.   You did not post this or contribute?
15      A.   That's correct.
16          MR. LAVERY:  What's the page number on
17  that, Chris, so we have it?
18          MR. MARKOS:  Gerhart 105 to 106.
19          MR. LAVERY:  Okay.
20          MR. MARKOS:  Actually to 107.
21  BY MR. MARKOS:
22      Q.   I think I asked you before and I will
23  ask you again, 122 now, cheat sheet to identify Camp
24  White Pine leaders and supporters.

Page 64

1           Did you contribute to this post?
2       A.   No.
3       Q.   This is 124, PA Progress posting a link
4   to BlackBadgerReport.com.
5           Did you create or contribute to this
6   post?
7       A.   No.
8       Q.   Do you know if Nick Johnson did?
9       A.   I don't know directly.
10      Q.   Do you know if anybody else had access
11  to PA Progress Facebook page?
12      A.   I do not know who had access to the
13  page.
14      Q.   I'm going to ask the same question
15  about Nick Johnson with what I already went through
16  with you, so page 105.
17          Do you know if Nick Johnson posted
18  this: New information on Huntington protest camp has
19  surfaced?
20      A.   I don't know who posted any of this
21  stuff on this site.  I don't know who had access to
22  it and I don't know who created it.  I can make
23  assumptions, but I do not know specifically.  I have
24  no firsthand knowledge.

Robert Rice

Page 65

```
1            MR. MARKOS:  Let's take a short break.
2            MR. LAVERY:  Sure.
3            MR. MARKOS:  Do you need more than five
4     minutes, everybody?
5            MR. LAVERY:  I don't.  Five will cover
6     what I need to do.
7            MS. WEISS-CALHOON:  Going off the
8     record at 11:25 Eastern Time.
9                  * * * * *
10    (Whereupon, a brief recess was taken.)
11                 * * * * *
12           (Whereupon, testimony resumed on the
13    stenographic and video records.)
14                 * * * * *
15           MS. WEISS-CALHOON:  We are now
16    recording and back on the record at 11:32
17    Eastern Time.
18    BY MR. MARKOS:
19        Q.   Robert, do you know if Nick Johnson
20    knew Derrick Borror?
21        A.   Yes.
22        Q.   Okay.
23             Did he know Derrick's family?
24        A.   I'm not aware.
```

Page 66

```
1         Q.   Do you know Derrick's family?
2         A.   I've never met them.
3         Q.   Okay.
4              MR. LAVERY:  Last name, Chris, Finley
5     or Finley?
6              MR. MARKOS:  I said Derrick's family.
7              MR. LAVERY:  Oh, Derrick's family.  Got
8     it.  Sorry.
9     BY MR. MARKOS:
10        Q.   Did you understand my question, Robert?
11        A.   I believe so, yeah.
12        Q.   Okay.
13             Are you being paid to be here today?
14        A.   I am not.
15        Q.   Okay.
16             Your position is that -- and I
17    shouldn't say position.
18             What you said before was you were what
19    you would call an independent contractor or a
20    consultant for TigerSwan, right?
21        A.   Say that again.
22        Q.   You were an independent consultant of
23    TigerSwan, that's your testimony?
24        A.   Yes.
```

Page 67

```
1         Q.   You were never an employee of
2     TigerSwan?
3         A.   That is correct.
4         Q.   Okay.
5              You're represented by an attorney
6     today; correct?
7              MR. LAVERY:  Yes, he is.  That's me.
8              MR. MARKOS:  Okay.
9     BY MR. MARKOS:
10        Q.   Did you -- since you said Kurt was your
11    referral source for Nick Johnson, Kurt Merriweather,
12    right?
13        A.   Yes.
14        Q.   And did you report to Kurt about Nick
15    Johnson's performance?
16        A.   I don't recall ever doing so, no.
17             MR. MARKOS:  Okay.  Sorry.  Let's go
18    off for one second.
19             MS. WEISS-CALHOON:  Off the record at
20    11:34 Eastern Time.
21                 * * * * *
22    (Whereupon, a brief recess was taken.)
23                 * * * * *
24             (Whereupon, testimony resumed on the
```

Page 68

```
1     stenographic and video records.)
2                  * * * * *
3              MS. WEISS-CALHOON:  We're back on the
4     record at 11:36 Eastern Time.
5     BY MR. MARKOS:
6         Q.   Do you recall, Robert, since we talked
7     a little bit about before one of the projects you
8     worked on -- worked on pertained to the Dakota Access
9     Pipeline, do you recall when encampments opposing the
10    pipeline were cleared out?
11             MR. LAVERY:  Are you talking about
12    Dakota Access Pipeline?
13             MR. MARKOS:  I am.
14             MR. LAVERY:  I think that's beyond the
15    scope of discovery as permitted by the Judge,
16    so I'm going to instruct him not to answer
17    that.
18             MS. CARFLEY:  And we join for the
19    Energy Transfer co-defendants.
20             MR. MARKOS:  I'm not asking about work
21    that was done on other pipelines.  My question
22    is if he knows when encampments were cleared
23    out, and I don't have a follow-up question to
24    that.  It's a yes or no.
```

Robert Rice

Page 69

1      MR. LAVERY:  All right.  All right.
2   You know what?  Just -- just go ahead
3   and answer it, if you know.  If you don't
4   know, that's fine, too.
5      THE WITNESS:  I don't know.
6      MR. LAVERY:  Don't guess.
7      THE WITNESS:  I don't know.
8      MR. MARKOS:  That's all I have.
9      MR. LAVERY:  Anybody else?
10     THE COURT REPORTER:  Excuse me.
11  Who joined in the objection because I
12  couldn't --
13     MS. CARFLEY:  It was Stephanie on
14  behalf of Energy Transfer.
15     MR. LAVERY:  All right.  Robert,
16  disconnect before they ask you something else,
17  sir.
18     MS. WEISS-CALHOON:  Let's end the
19  video.
20     So there's no other questions; correct?
21  All right.  Well, that concludes the
22  deposition at 11:38 Eastern Time.
23          *  *  *  *  *
24     (Whereupon, a discussion was held on

Page 70

1   the stenographic record only.)
2          *  *  *  *  *
3      THE COURT REPORTER:  So I have
4   questions I need to ask the attorneys about
5   the transcript.
6      Christopher, do you get full size,
7   minuscript or both, Christopher Markos?
8      MR. MARKOS:  I would just like a mini,
9   Susan.
10     THE COURT REPORTER:  Frank?
11     MR. LAVERY:  Mini, emailed, please with
12  exhibits, to the extent you get them.
13     THE COURT REPORTER:  How about
14  Christopher Gerber?
15     MR. GERBER:  Mini is fine.
16     THE COURT REPORTER:  Stephanie?
17     MS. CARFLEY:  Mini, please.
18     THE COURT REPORTER:  Jessica?
19     MS. DAVIS:  Just a mini, please.
20     THE COURT REPORTER:  Is regular
21  delivery time okay?
22     MR. MARKOS:  Regular is fine.
23          *  *  *  *  *
24     (Whereupon, the videotaped deposition

Page 71

1   was concluded at 11:39 a.m. and Robert Rice
2   was excused.)
3          *  *  *  *  *
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 72

1         C E R T I F I C A T I O N
2
3      I hereby certify that the proceedings and
4   evidence noted are contained fully and accurately in
5   the stenographic notes taken by me upon the foregoing
6   matter on Thursday, May 5, 2022, and that this
7   is a correct transcript of the testimony given by the
8   witness of the same.
9
10
11
    _____
    Susan L. Singlar
12  Registered Professional Reporter
    and Notary Public
13  My Commission Expires:
    November 20, 2022
14
15
16  (The foregoing certification of this transcript
17  does not apply to any reproduction of the same by any
18  means, unless under the direct control and/or
19  supervision of the certifying reporter.)
20
21
22
23
24

18  (Pages 69 to 72)

Robert Rice

## A

**a.m** 1:14 5:9
71:1
**Abitbtib@mc...**
2:17
**able** 56:20
**access** 55:10
64:10,12,21
68:8,12
**accommodate**
10:10
**account** 9:15
20:4,14,15,17
42:19
**accountant**
57:11,13,16,17
57:21
**accurately** 72:4
**act** 9:13
**activist** 61:5
**activists** 51:5
**actual** 20:13,15
20:17
**added** 62:21
**address** 20:1
21:4 42:17
**administer** 6:8
**advised** 13:9
**agency** 1:17
**ago** 8:17 15:12
**agree** 56:4
**agreement** 25:4
25:7,10,15,18
31:15 35:16,23
**ahead** 30:7
52:13 55:2
69:2
**al** 1:6 5:11,12
36:19,21
**Alan** 2:15 6:1,23
42:23
**ALEX** 1:3
**alias** 20:3,6,13
**aliases** 42:12,15
42:20
**allow** 34:19

## (col 2)

**American** 61:6
**and/or** 72:18
**answer** 4:20
10:3,10,17
21:6 23:16
41:6 49:15
52:13 53:17
54:7 55:2
68:16 69:3
**answer's** 55:19
**answered** 25:13
**answers** 9:17
34:19
**anybody** 9:18
12:22 13:7,24
23:2 59:16,18
59:20 64:10
69:9
**Apex** 17:16,19
18:24 21:22,22
22:23
**appearance** 5:15
**APPEARAN...**
3:1
**appearing** 7:15
**apply** 72:17
**appreciate**
32:12
**approval** 34:5
**area** 37:23,24
**articles** 61:11
**asked** 10:16
45:19 53:19
54:12 62:13
63:22
**asking** 13:1
23:14 26:16
27:21 29:6
30:20 34:18
41:22 43:8
49:8 51:6
53:22 54:15
68:20
**asks** 44:4
**assessment** 24:8
**assigned** 52:9

## (col 3)

**assigning** 52:8
**ASSISTANT**
3:3
**associated** 21:19
**assume** 28:9
**assumed** 10:11
**assuming** 36:4,7
**assumptions**
64:23
**attorney** 34:1
67:5
**attorneys** 5:14
14:12 15:2
34:7 70:4
**Audio** 3:22
**augmented** 46:2
**August** 56:9
**author** 43:14
**authorization**
1:17
**available** 39:16
39:17
**Avenue** 3:4
**aware** 38:13
39:12 45:14
59:20 65:24

## B

**B** 4:8
**back** 12:19
13:19 19:15
25:21 34:5,19
36:3 57:3,10
58:15 60:16
63:3 65:16
68:3
**background**
45:22,23
**backslash** 48:24
48:24,24 49:1
50:4,4,5,5
**backup** 17:7
**Bad** 26:13
**Badger** 4:14
39:6 43:18
**bank** 57:4

## (col 4)

**basic** 41:3
**basically** 39:19
**basis** 56:23
**Bates** 28:22 29:9
59:23 60:10
62:1
**bed** 12:19
**beginning** 1:14
**behalf** 69:14
**belief** 7:15
**believe** 8:21
21:5,11 24:16
25:6 30:2
39:14 45:18
49:16 50:10
51:9,13 54:8
60:14 66:11
**BELLWOAR**
3:15
**Benson** 3:7
**best** 7:14 8:9
9:13 10:10
**beyond** 68:14
**big** 37:15 53:5
**bigger** 43:4,5
**bit** 59:2 68:7
**Black** 4:14 39:6
43:17
**BlackBadger...**
39:8,22 40:15
64:4
**blame** 58:22
**blanking** 13:18
**blockchain** 46:3
**Borror** 36:10,12
37:9 65:20
**bottom** 41:3
**box** 16:4
**Boynton** 2:15
6:1,1,24
**brand** 18:3
**break** 10:15,17
65:1
**Brian** 37:3
**Bricchi** 44:20
**Bridge** 50:5

## (col 5)

**brief** 65:10
67:22
**bringing** 32:13
**Broad** 1:23
**broader** 31:9
**brought** 35:20
**browser** 40:10
**build** 31:9
**building** 31:9
53:12 54:3
**built** 53:13
**bunch** 33:18
**bust** 42:1

## C

**C** 2:1 72:1,1
**call** 13:8,15,16
13:23 66:19
**called** 13:10,17
38:4 39:5
44:24 50:2
**camp** 50:6 51:4
61:8 63:23
64:18
**candidate** 27:21
**caption** 62:20
**careful** 32:10
**Carfley** 2:14
5:23,23 7:4
68:18 69:13
70:17
**Carolina** 1:13
9:6 15:17
**case** 8:12,23 9:6
11:4 14:3,18
28:12 60:2,6
**casual** 52:6
**Cedar** 2:3 29:9
33:17
**cell** 26:9,11,12
26:14
**certainly** 21:23
32:11,15
**certification**
72:16
**certified** 5:3

certify 72:3
certifying 1:17
  72:19
Chad 37:1
changes 21:18
characterize
  45:24
charge 50:3
chat 26:1
chatted 37:14
cheat 63:23
Cheryl 37:11
Chester 3:16
Chris 3:22 5:2
  8:11 28:21
  50:21 57:17
  60:12 63:17
  66:4
Christopher 2:3
  3:15 5:16 6:17
  7:10,11 29:10
  48:7 70:6,7,14
circle 51:4
clarify 32:1
clean 12:2
clear 10:2 29:2
  32:18 42:1,2
cleared 68:10,22
clearly 23:17
client 23:18
  24:13,15
clients 23:13
clip 46:14 47:16
  50:14
clue 24:20
Cmarkos@wil...
  2:5
co-defendants
  68:19
collaborative
  31:23
collegiate 31:22
come 13:19 28:6
  38:10 47:2
Commission
  72:13

common 42:16
Commonwealth
  1:15
communication
  26:6
communist 61:7
company 49:18
  49:22 56:16
Complaint
  14:17
computer 16:9
  17:3,20 58:17
concluded 71:1
concludes 69:21
conference
  15:13,14
Conferencing
  1:12
configuring
  40:1
confusion 32:6
connect 34:9,12
connected 61:7
connection
  27:17
considerations
  9:14
considered 41:4
consultant 22:3
  22:17 35:14
  53:12 54:4
  56:3 66:20,22
consulting 22:22
  23:6,9,14
  24:23 25:6
  27:17 33:15
  49:11,17 56:15
contained 72:4
content 39:22
  40:22 41:5
  43:14
context 31:5
  34:1 35:8 40:5
  52:3
continued 3:1
contract 22:2

32:20,24 33:2
  33:11 49:17
contracting
  24:24
contractor
  35:12,15 56:3
  57:6 66:19
contribute 47:8
  63:9,14 64:1,5
contributing
  38:12 61:21
  62:14
control 12:21
  49:22 72:18
controlled 56:17
conversation
  9:19 10:4
  28:19 34:7
  35:3,5 38:10
  39:4
conversations
  12:24 38:14,17
  59:5
copy 25:8
copyright 41:3
corner 37:23
correct 17:15,17
  17:18 18:17
  20:9,16 30:4
  35:18 40:12
  54:23 63:15
  67:3,6 69:20
  72:7
correctly 20:20
  39:21
counsel 3:3 6:10
  7:13
country 23:19
course 52:14
  56:14
court 1:1,14 5:6
  6:6,9,11,20,22
  7:1,6,8,10,13
  7:19 10:23
  11:4 29:10,12
  29:20 48:7,9

48:17,20 69:10
  70:3,10,13,16
  70:18,20
cover 65:5
Cpgerber@si...
  3:17
create 64:5
created 64:22
creating 62:14
  63:6
creator 43:24
  44:5
credentials
  18:20 19:3,5,8
cursor 19:16
  25:22
cyber 46:4 55:21

─────────────
          D
─────────────
D 4:1
Dakota 55:9
  68:8,12
DAPL 33:2,11
  49:1
date 5:7 6:16
  22:7
Davis 3:4 6:3,3
  7:7 70:19
day 10:14 11:3
dedicated 37:21
defendants 1:7
  6:4
definitely 62:8
degree 14:19
  52:19 58:18
delivery 70:21
deponent 5:12
  6:12,13
deposition 1:13
  5:5,10 8:13,20
  9:9 10:21
  14:22 43:2
  45:6 69:22
  70:24
Derrick 36:10
  36:12 37:9

65:20
Derrick's 65:23
  66:1,6,7
describe 15:2
  17:24 25:1
described 16:4
  18:6,15
DESCRIPTI...
  4:10
desk 37:22 38:1
desktop 18:1,2
detail 14:20
details 28:19
  61:8
determination
  28:11
determine 56:21
development
  27:24
device 17:21,22
  18:20,24
DF 19:15
dictate 48:19
differences 31:3
different 19:12
  20:5 53:19
differently
  13:14
dig 31:8 52:23
digging 53:2,12
  54:3
direct 31:21
  35:12 72:18
direction 4:20
  52:17 54:21
directly 34:14
  35:16,23 56:16
  56:18 64:9
disclosing 57:20
disclosures 60:4
  62:9
disconnect
  69:16
discovery 68:15
discuss 52:16
discussing 52:21

discussion 69:24
**District** 1:1,1
  5:6,7
**ditch** 31:8,10
  52:20,21 53:2
  53:12 54:3
**document** 11:10
  11:16 12:8,13
  12:23 14:1,7
  15:5 16:2
  19:12 25:21
  28:22 29:19,24
  30:16,19,22
  34:6 45:17
  60:17
**documentation**
  55:4
**documents** 4:15
  12:2 14:21
  16:4 18:6,10
  18:15 29:8
**doing** 21:21
  22:21 23:6
  24:8 27:18
  28:17 35:21
  41:19 42:12
  51:12 52:2
  67:16
**domain** 39:7,13
  39:15
**door** 12:17
**dot** 20:18,19
**doubting** 60:11
**dragnet** 49:5
**dug** 52:20
**duly** 8:1
**Dunsmore** 3:7
  6:5
**duration** 31:15

---
**E**
---
**E** 2:1,1 4:1,8
  72:1
**earlier** 34:23
  54:2,9
**early** 12:15

**East** 32:5 33:10
  33:14
**Eastern** 5:9 65:8
  65:17 67:20
  68:4 69:22
**effort** 16:3
**egalitarian**
  51:15,18
**Ehgartner** 3:7
  6:5
**either** 10:8
  20:18 28:22
  38:12 50:24
  51:1 53:13
  55:13 61:20
**ELISE** 1:2
**ELIZABETH**
  1:3
**Ellen** 1:2 5:11
**Elmerton** 3:4
**email** 16:9 19:21
  20:1,2 21:4
  29:14 42:18
**emailed** 70:11
**emails** 4:12
  21:24 22:6
  29:18
**employed** 22:2
**employee** 67:1
**employees** 37:6
**employers** 49:11
**encampments**
  68:9,22
**ended** 50:24
**energy** 1:6 2:18
  5:12,24 6:2
  24:13 53:14,23
  55:6,13 61:6
  68:19 69:14
**entailed** 42:6
**entities** 53:23
  54:5
**environment**
  53:4,6
**environmental**
  61:5

**especially** 9:19
**ESQUIRE** 2:3,9
  2:14,15 3:4,10
  3:15
**estimate** 15:11
**et** 1:6 5:11,12
**everybody** 8:8
  65:4
**evidence** 72:4
**exactly** 27:15
  45:21
**EXAMINATI...**
  4:6 8:4
**examined** 8:2
**example** 52:20
**exception** 7:22
**Excuse** 69:10
**excused** 71:2
**exhibit** 28:23
**Exhibit-1** 4:11
  15:20 29:17
**Exhibit-2** 4:12
  29:18 43:2
**Exhibit-3** 4:13
  29:19
**Exhibit-4** 4:14
  59:22
**Exhibit-5** 4:15
**Exhibit-9** 45:5
**exhibits** 70:12
**existed** 39:13
**expert** 45:24
**Expires** 72:13
**explain** 31:19
**extent** 16:5
  70:12

---
**F**
---
**F** 72:1
**face-to-face** 9:12
  36:18
**Facebook** 38:3
  43:15 44:1,7
  44:11,16,19,24
  48:4 59:19
  64:11

**facilitated** 26:23
**facility** 24:8,16
  24:16 55:17
**fact** 39:12
**fair** 12:20 26:13
  35:10 36:2
  41:9,20 51:16
  51:22 57:5
**fairly** 52:5
**familiar** 14:17
  27:24 37:4
  38:3,5,9 39:5,7
  44:21,24 48:4
  61:19
**family** 65:23
  66:1,6,7
**far** 10:5 57:3
**figure** 23:16
  57:1
**filed** 57:7
**files** 17:7
**find** 18:10,12
  57:4 60:9
**fine** 7:12,21
  13:20 15:3
  30:8 48:16
  51:1 57:22
  58:7,23 59:1
  69:4 70:15,22
**finish** 9:16 10:17
**Finley** 66:4,5
**firm** 12:24 49:2
**first** 9:16 34:6
  48:3,5,14 51:9
**firsthand** 64:24
**five** 43:22 65:3,5
**Flavery@lave...**
  3:12
**focusing** 54:20
**follow-up** 68:23
**follows** 8:2
**foregoing** 72:5
  72:16
**foremost** 9:16
**forget** 29:5,22
**Fork** 29:9 33:17

**form** 22:24
  25:12 44:3
  49:13 52:11
  53:16 54:6
  56:12
**forwarder** 20:4
**forwarding**
  20:13,13
**found** 47:4
  62:10
**foundation**
  52:12
**four** 43:3,9,10
**framework** 40:6
**Frank** 3:10 5:20
  7:8 12:24 29:3
  54:24 57:22
  60:4 70:10
**front** 40:2,4,5
**full** 42:17 70:6
**fully** 72:4
**funding** 61:5
**funny** 39:3
**future** 6:16

---
**G**
---
**games** 46:5
**general** 13:16
  17:9 31:1,6
  41:11 51:23
  54:16
**Gerber** 3:15
  7:11,12 70:14
  70:15
**Gerhart** 1:2,2
  5:11 62:2 63:3
  63:18
**gesture** 9:23
**give** 13:11 44:22
  57:15,15,24
  60:8 62:4
**given** 8:13,19
  9:9 72:7
**glancing** 11:18
**GLUNT** 1:3
**go** 9:9,15 16:23

30:6 34:19
45:8 52:13,18
52:24 55:2
67:17 69:2
**goes** 8:7
**going** 9:23 22:18
30:6 33:18
36:3 41:21
45:5 46:20
50:11 57:9
58:22 62:12
64:14 65:7
68:16
**Good** 58:19
**grab** 52:22,24
53:1
**graphics** 40:24
46:1
**great** 53:5,22
**Green** 44:24
45:2
**ground** 9:10
**groups** 61:5,7
**guess** 12:14 15:1
16:18 21:14
50:3 69:6
**guys** 46:10
58:20

**H**

**H** 4:8
**Hailey** 37:11
**hallway** 37:14
38:1
**handled** 30:24
**happy** 60:10
**hard** 9:18 60:7
**Harrisburg** 2:16
3:5,11
**head** 9:24,24
**header** 40:24
**headquarters**
22:23
**hear** 8:7 36:6,11
46:10 58:11,12
58:21,23,24

**heard** 37:2
**Heidi** 37:10,11
**held** 1:13 5:10
69:24
**hello-TigerSw...**
35:3
**help** 35:1,21
51:12 63:5
**helpful** 43:5
**helping** 59:18
**hey** 39:2,3 46:10
**highlighted** 20:8
**highly** 53:6
**history** 49:9
**honestly** 22:9
**hoover** 61:11
**house** 53:12,13
54:3,4
**HR** 37:10
**hundred** 8:9
**Huntington**
64:18
**hyphen** 49:1,1,2
49:2,3,3,3,4,4
49:5,5
**hyphens** 50:6

**I**

**i.e** 31:7
**ID** 42:18
**idea** 16:22 18:4
37:16,19 42:22
56:10
**identified** 43:24
**identifies** 30:19
**identify** 44:5
48:21,22 63:23
**images** 45:16
60:18
**implication**
32:19
**important** 9:22
**Inaudible** 58:10
**independent**
35:12 56:2
57:6 66:19,22

**indicate** 28:22
**individuals** 44:6
**industry** 15:13
31:6 41:5,10
45:24
**information**
33:3,11 64:18
**initial** 60:4 62:9
**insight** 35:8
**instruct** 68:16
**instructions**
32:4
**intentions** 36:1
**interact** 37:7
**interaction** 37:5
**interactive** 46:1
**Intercept** 61:6
**interchangeable**
25:2
**intermediary**
35:17
**internet** 40:11
40:15 47:13
**interview** 51:4
**introduced** 27:5
28:3
**introduction**
26:23 34:13
**invoice** 33:19
34:4
**involved** 22:10
35:6 38:12
43:18 44:6,10
44:15,17 51:11
55:4
**involvement**
60:24 62:24
**issue** 19:3
**issued** 19:7
26:14
**issues** 24:9

**J**

**Jessica** 3:4 6:3
7:3,6 70:18
**Jessicdavi@p...**

3:6
**Jim** 36:14 37:9
**job** 49:11
**John** 36:23
**Johnson** 3:18
13:4 14:7
20:22,24 26:19
26:23 27:6
28:4,13,16
31:17 33:19
35:21 51:12
52:2,9 59:6
64:8,15,17
65:19 67:11
**Johnson's** 21:4
43:2 45:6
67:15
**join** 68:18
**joined** 69:11
**judge** 32:4 68:15
**July** 22:8 25:23
56:3
**jumped** 50:17

**K**

**K** 50:3
**Kaplan** 1:22 6:7
**keep** 16:24 60:7
**kind** 12:18 19:8
22:2 28:14
34:23 37:24
40:7 51:15
52:24 59:1
**Kira** 50:5 51:4
**knew** 34:16,22
35:7 65:20
**knock** 12:17
**know** 8:23 10:20
10:20 12:1,16
12:23 13:10
14:12 15:8,10
15:24 18:3
20:21 21:14,16
21:17 23:20
24:15 27:3,6,8
28:23,24 29:3

30:18 32:9,16
35:4,8,11,12
35:20 36:10,17
37:17 39:24
40:3,7,24
42:17,17,18
44:20 45:19
46:4 51:6 52:8
52:18,19,21,22
53:3,5,11
56:16 57:3,3,4
57:23 58:3,5
58:22 60:8
64:8,9,10,12
64:17,20,21,22
64:23 65:19,23
66:1 69:2,3,4,5
69:7
**knowledge** 7:15
64:24
**known** 36:4,7
**knows** 68:22
**Kurt** 15:4 26:20
26:22 27:5,11
27:14 28:3
31:14 34:9,16
34:22 38:18
67:10,11,14

**L**

**L** 1:14 72:11
**L.P** 1:6 2:19,19
2:19
**laptop** 18:1
**late** 12:16
**launching** 49:4
**Lavery** 3:9,10
5:20,20 7:9,17
7:18,21 22:16
22:24 25:12
28:21 29:6
32:1,11 40:17
41:21 44:3
49:13 50:20,23
52:11 53:16
54:6,14,18

55:1 56:11
57:14,23 58:5
58:14,19,23
60:1,5,11 62:3
62:7 63:16,19
65:2,5 66:4,7
67:7 68:11,14
69:1,6,9,15
70:11
**LAW** 3:9
**leaders** 63:24
**leaks** 61:8
**LEAMAN** 1:22
**left** 31:12 52:23
**legal** 5:3
**Lehman** 6:8
**LENGERT** 2:8
**let's** 9:12 46:6
49:10 65:1
67:17 69:18
**Libertarian**
45:1,2
**life** 61:8
**LINE** 4:22
**lines** 40:8
**link** 26:1 62:16
64:3
**links** 61:1,2,12
61:18,20
**list** 53:5
**listen** 51:7
**literally** 13:18
**little** 12:15,17
13:13 43:5
45:20 55:23
59:1 68:7
**live** 46:3 50:5
**LLC** 2:3,8 3:13
**LLP** 3:15
**locate** 16:3
**location** 55:22
**locations** 23:12
**log** 18:21 19:3
**logged** 19:9
**Logistics** 2:19
24:14 53:15,24

**long** 51:6 58:24
63:11
**look** 16:8,11,13
56:20 61:19
**looked** 14:24
62:17
**looking** 27:23
28:7 34:24
43:21 44:23
60:22 61:15
**looks** 11:19,22
32:14
**lot** 32:23
**LOTORTO** 1:3
**Louisiana** 48:2
48:5
**love** 12:2
**luck** 58:19

---

**M**

**maintain** 57:9
**majority** 41:23
**making** 40:21
44:6,10,15,18
**managed** 53:6
**manager** 30:9
30:10,17,20
31:2,4,4,7,8
**manages** 30:11
**managing** 30:12
30:19
**Mariner** 32:5,16
32:19 33:10,14
**mark** 15:20
29:13
**marked** 43:1
45:5
**Market** 2:4 3:10
**markets** 61:6
**Markos** 2:3 4:6
5:16,16 6:19
8:6,11 15:19
15:21 22:18,20
23:4,5 25:14
29:3,8,11,16
29:21,23 32:9

32:21,22 41:8
42:4,10 44:9
46:17 47:19
48:8,13,18,22
49:7,20 50:17
50:22 51:2
53:9,21 54:11
54:17,24 55:7
56:13 57:22
58:3,8,9,17,20
59:3,4,22 60:3
60:8,15 62:6,8
62:11 63:18,20
63:21 65:1,3
65:18 66:6,9
67:8,9,17 68:5
68:13,20 69:8
70:7,8,22
**matter** 5:11 72:6
**MCANDREW**
3:15
**McGinty** 37:1
**McKinnon**
36:16
**McNEES** 2:14
**ME2** 54:10,20
54:22
**mean** 11:22
17:14 19:5
28:24 30:9
31:19 32:15
34:11 35:5
40:17,19 41:4
42:15,19 49:16
57:16 59:17
**Meaning** 39:8
**means** 30:10
72:18
**meant** 19:23
**mechanics** 12:21
**media** 28:1
41:16,20 42:9
46:1
**meet** 26:19
**meeting** 34:1
36:18

**mentioned**
34:23 55:16
59:6
**Merriweather**
15:4 26:21,22
27:5,12,14
31:14 34:9,16
38:18 67:11
**met** 15:11 36:24
66:2
**metaphor** 53:11
54:2
**microphone**
58:15
**microphones**
58:18
**middle** 1:1 5:6
11:12 15:22
**mini** 70:8,11,15
70:17,19
**minuscript** 70:7
**minutes** 65:4
**moment** 13:18
**Monday** 25:23
**monitor** 5:8
**month** 12:10
**morning** 12:15
**move** 58:14 59:1
**multi** 49:5
**mute** 7:5

---

**N**

**N** 2:1 4:1 20:24
72:1
**name** 5:2 8:11
13:12,18 19:6
19:10 20:5
27:6 30:4
31:12 32:13,24
33:2 36:17
39:7,13 40:9
42:17 44:21
66:4
**named** 32:2
33:11
**names** 32:4

38:20
**narrow** 42:7
**Nate** 20:22
**nature** 46:5
**need** 9:14 10:15
12:3 17:1 43:4
52:4,16,17
65:3,6 70:4
**needed** 22:3,13
22:17 52:20
**never** 36:24 37:2
39:22 66:2
67:1
**new** 16:14,16
64:18
**Nick** 3:18 13:4
14:6 21:3
26:19,23 27:6
28:4,13,16
31:17 33:19
34:24 35:1,20
36:16 38:16,23
39:19 43:2
45:6 51:11,12
52:2,9 59:6
64:8,15,17
65:19 67:11,14
**night** 12:16
**nod** 9:24
**Nope** 48:1
**normal** 52:14
53:3
**North** 1:13 2:9
9:6 15:17
**Notary** 1:15
72:12
**note** 50:17
**noted** 72:4
**notes** 72:5
**notice** 1:13
**November** 72:13
**number** 4:10
13:16 28:23,23
43:3,9,10,21
63:16
**numbers** 62:5

**NURICK** 2:14

**O**

**O** 72:1
**oath** 6:8 10:22
**object** 22:24
  25:12 41:21
  44:3 49:13
  52:11 53:16
  54:6 56:11
**objection** 6:14
  6:15 22:16
  69:11
**obstruct** 57:24
**obviously** 12:21
  12:24 28:24
  37:9
**occasions** 23:17
**off-site** 23:22
  24:1
**offhand** 12:9
**office** 17:16,19
  19:1 21:22,22
  23:8 37:13,15
  37:17,21 38:2
**Oh** 7:4 30:21
  40:5 61:11
  66:7
**okay** 8:22 9:5,8
  10:12,18 11:2
  11:7,24 12:5,6
  12:11 13:3,6
  13:20 14:5,10
  14:16 15:3,7
  15:16 16:7,10
  16:15,19 17:2
  17:6,23 18:7
  18:18 19:11
  20:10 21:20
  22:13 24:12,17
  25:3 26:2,18
  27:4,10 30:3
  31:11 33:8,23
  34:2,8 35:19
  39:11,20 41:13
  42:11 43:1,13

43:20,23 45:4
45:15 46:9,12
46:23 48:17,22
50:2 51:24
54:1,13 55:1
55:20 56:1,7
56:19 58:8
60:7,21 61:3,9
61:12 62:1,7
62:12,19 63:19
65:22 66:3,12
66:15 67:4,8
67:17 70:21
**open** 37:24,24
**Operations** 33:3
  33:11
**opposing** 68:9
**Order/Assign...**
  4:13
**Ornoski** 36:19
  36:21
**outside** 47:12
**overall** 27:24
**overboard** 25:13
**owned** 39:15

**P**

**P** 2:1,1 3:15
**PA** 1:23 38:4,24
  43:14,18 44:1
  44:7,11,16,18
  59:6 62:15,20
  64:3,11
**page** 4:2,10,22
  9:11 19:14
  38:3 43:15
  44:1,8,11,16
  44:19,24 48:4
  59:19 60:17
  61:1 63:16
  64:11,13,16
**paid** 56:18,22,23
  57:2 66:13
**paragraph** 16:4
**parenthetical**
  48:11,14

**parlance** 31:6
**part** 42:5 62:8
**particular** 9:14
  21:13 33:19
**Partners** 1:6
  2:19 5:12,24
  6:2 24:14
  53:14,23
**party** 9:1
**passing** 37:13
**password** 19:6
**pay** 56:15,16
**payment** 34:5
  56:21
**payroll** 37:10
**PDF** 60:16
**Pennsylvania**
  1:1,15 2:4,10
  2:16 3:3,5,11
  3:16 5:7 6:4
  23:23 24:2,19
  33:10,14
**people** 34:15
  37:10,12 42:16
**percent** 8:9
**Perfectly** 35:10
**perform** 26:7,15
**performance**
  67:15
**period** 21:21
  25:15 41:14,18
  42:6,21
**peripherally**
  38:5,7,13
**permitted** 68:15
**person** 13:15,17
  15:8 21:15
  47:11
**person's** 48:11
**personal** 8:24
  9:3,4 17:9,20
  26:9,11,12
  42:15 57:16,20
**personnel** 9:3
  21:18
**pertained** 68:8

**pertaining** 33:13
**Philadelphia**
  1:23 2:4
**phone** 13:23
  14:8 16:11,13
  16:14,20,23
  26:9,11,14
**phones** 26:12
**physical** 6:13
  55:22,22,24
**Pike** 3:16
**Pine** 2:15 50:6
  51:5 63:24
**pipeline** 2:19
  5:24 6:2 24:10
  24:14 33:10,14
  49:3 53:14,24
  54:10 55:10
  68:9,10,12
**pipelines** 68:21
**Pixel** 16:17
**plaintiff** 5:19
**plaintiffs** 1:4 2:6
  2:12 5:17 8:11
**play** 48:9 50:12
**played** 46:15
  47:17 48:12
  50:15,18,20
**please** 5:14 6:18
  10:9 11:20
  70:11,17,19
**point** 28:3 32:3
  54:15 59:9
**Police** 3:3 6:4
**Porter** 36:23
**position** 18:14
  66:16,17
**post** 63:9,14
  64:1,6
**posted** 39:22
  40:14 44:1,7
  44:11,16,18
  64:17,20
**posting** 62:24
  63:6 64:3
**posts** 40:22

62:15
**Pottstown** 3:16
**preliminary**
  11:8
**prepare** 14:22
**prepared** 7:23
**presence** 6:13
**present** 1:15
  3:20
**pretty** 28:1
  42:14 60:3
**previous** 21:7
  55:3
**previously** 22:14
  29:13 43:1
  45:5
**primarily** 37:7
**privileged** 13:1
**probably** 15:12
  41:2 42:24
  45:19 50:1
**problem** 10:16
  58:16 59:2
**proceedings**
  72:3
**produced** 60:1,2
**production** 4:17
  28:1 47:8
**Professional**
  1:14,22 72:12
**program** 31:4,8
**Progress** 38:4,24
  43:15,19 44:1
  44:7,11,16,18
  59:6 62:15,20
  64:3,11
**prohibited** 1:17
**project** 30:9,10
  30:11,12,17,18
  30:19 31:2,4,6
  31:7 32:2,14
  33:4 55:5,9
**projects** 30:23
  30:24 33:7
  54:18 55:12,13
  68:7

proper 58:1
protector 61:8
protest 64:18
provide 25:18
  60:10
provided 25:5
province 32:17
psychopaths
  50:3
Public 1:15
  72:12
pull 11:9
pursuant 1:13
  25:5 33:10,14
put 12:18 30:23
  48:11,13 62:1

**Q**

qualifications
  28:7
question 10:7,9
  10:10,16 17:13
  21:7 26:13
  30:15,20 32:7
  43:3 44:4,8
  45:9 49:14
  51:7 61:13,22
  63:4,12 64:14
  66:10 68:21,23
questions 9:17
  62:13 69:20
  70:4
quite 34:17
quote 58:18

**R**

R 2:1 20:18 72:1
R2 19:18 20:6
  20:12
Raider 5:18
RAIDERS 2:8,9
  5:18 6:21
Raleigh 1:13
reached 18:5
  21:12
read 7:22 11:20

12:14,18 15:24
  16:1 48:23
reading 2:10
  11:18
reality 46:2,2
really 34:3 35:6
reason 21:12
recall 11:16 12:7
  19:7 21:3
  25:10 27:1,16
  35:2 36:17
  37:4 38:19
  43:16,18 44:17
  49:24 51:7,17
  56:6,8 61:19
  63:8 67:16
  68:6,9
received 11:19
  12:7 13:9
receiving 12:12
  12:22 13:24
  14:7 15:5 16:2
recess 65:10
  67:22
recollection
  60:23 61:16
  62:14,23 63:5
record 5:2,4,13
  5:15 6:11 10:3
  15:19 32:6,18
  42:1,2 54:15
  65:8,16 67:19
  68:4 70:1
record's 29:1
recording 65:16
records 56:21
  57:4,9,17
  65:13 68:1
Reese 36:14
  37:9
refer 27:22
referenced 55:9
referral 26:20
  27:9,11 34:23
  67:11
referring 61:10

refresh 60:23
  61:16
Registered 1:22
  72:12
regular 56:23
  70:20,22
relate 18:15
related 8:24
  24:10 32:16
  33:9 42:9
  53:23 54:10
  55:5 57:17
relates 32:14
relationship
  25:19 31:22
  52:5,15
remember 8:16
  13:12,21 16:20
  20:19 21:6,23
  22:9 24:4,6,18
  24:21 25:20
  26:8,22 27:20
  28:12,15,18
  29:14 33:6
  36:22 39:1,14
  40:18,19,21,23
  42:20 47:3,4,6
  47:7,22,24
  49:10 60:13
remote 1:12
repeat 61:13
rephrase 34:20
report 4:14 31:2
  31:14,21 39:6
  43:18 61:4,6,7
  67:14
reporter 1:14
  6:7,9,11,20,22
  7:1,6,8,10,13
  7:19 29:10,12
  29:20 48:7,9
  48:17,20 69:10
  70:3,10,13,16
  70:18,20 72:12
  72:19
Reporters 1:22

reporting 48:2
  51:20
reports 31:13
  32:23
represent 7:14
  8:11
represented
  67:5
representing 2:6
  2:12,18 3:7,13
  3:18 5:21
reproduction
  1:16 72:17
request 27:11
  57:18 58:1
REQUESTS
  4:17
respective 9:17
respondent 49:2
response 43:11
responses 9:23
rest 45:17
resumed 65:12
  67:24
retained 5:3
review 55:16
reviewed 14:21
Rice 1:13 4:3
  5:13,22 7:16
  8:1 20:18,19
  30:16 31:2
  42:23 71:1
Rich 5:18
Rich@raiders...
  2:11
Richard 2:9
  6:20
right 11:15 13:5
  20:8 23:21
  34:21 35:13,17
  41:16 43:22
  50:23 51:12
  55:8,10 56:5
  57:7 58:24
  59:7 60:22
  61:15 63:3

66:20 67:12
  69:1,1,15,21
Robert 1:13 4:3
  5:13,21 7:16
  8:1,10 20:19
  29:24 30:16
  31:2 32:24
  50:9 51:8 55:2
  60:19 62:13
  65:19 66:10
  68:6 69:15
  71:1
Roberto 44:20
rules 9:10
Russian 61:4,4

**S**

s 2:1,18 4:8
salary 56:24
satisfied 28:6
save 16:24
saw 47:22 50:23
saying 23:1
  48:11 51:17
  60:12
says 11:12 19:18
  20:22,24 30:16
  31:1,12 32:24
  44:5,13 50:22
  51:3
Scarfley@mc...
  2:17
scope 68:15
screen 29:1
scroll 12:4 63:11
scrolled 19:14
scrolling 20:21
  45:7
searched 18:11
sec 44:22
second 13:11
  34:19 48:15
  50:12 60:9,17
  67:18
seconds 46:14
  46:18 47:16

48:14,15 50:14
   50:18
security 24:8
   46:4 49:1
   55:16,21
see 9:21 11:9
   15:22 19:12,16
   19:18 20:22
   22:7 25:22
   29:1 33:24
   40:10,16 43:3
   43:11,21 44:2
   46:6,7 47:2,24
   60:18,22 61:11
   61:12 62:16
seeing 11:16
   34:6 47:12
seen 29:24 33:21
   37:13 45:9,12
   45:16 46:20,24
   47:11,20 50:8
self 52:18
sense 9:10 10:5
   23:11 53:8
separate 45:17
seriously 57:23
server 40:1
services 25:5
set 9:14 29:8,18
setting 39:24
   41:1
shake 9:24 61:5
shared 47:5 55:4
sharing 12:2
   51:16
Shawn 21:11
   36:4,7 37:8
sheet 4:13 63:23
shocking 61:8
short 65:1
shoulder 51:21
shovel 52:22
   53:1
show 33:18 45:5
showed 29:13,16
   29:17

shown 55:3
SIANA 3:15
side 40:1 53:2
sign 7:22
similarly 9:21
   9:24
simple 51:7
simulations 46:3
Singlar 1:14 6:7
   72:11
sir 69:17
sit 52:15
site 23:18 64:21
six 8:17 47:16
   48:15
size 70:6
skip 7:1
small 14:19
Smith 37:3
smoothly 9:15
social 28:1 41:16
   41:20 42:9
soft 10:8
somebody 21:14
   27:23 34:22
   35:1,7 40:10
   52:1 53:4
   56:24
sorry 7:4 12:20
   16:12 18:22
   20:11,11 36:6
   36:20 41:17
   44:22 56:11,12
   61:12 62:3
   66:8 67:17
sort 11:7 31:18
   31:19,22 35:3
   39:4 41:1
   52:18 53:6
sound 10:1
sounds 56:5
source 34:24
   58:16 67:11
South 1:23
space 37:17,21
   37:22

speak 8:8
Specialist 3:22
specific 13:15,17
   25:15 28:12
   30:13,15,21,23
   31:7 34:11,18
   35:2 38:2 41:7
   43:17 53:7,18
specifically 13:8
   26:8 28:15
   41:20 57:18
   60:12 64:23
specifics 27:16
   28:18
speculate 35:24
   39:1
spent 17:15
   38:11
spoken 13:24
Springs 3:16
Squarespace
   40:8
stamp 60:10
stamped 29:9
   59:23 62:2
start 53:1
started 19:9
startup 49:19
state 3:3 5:14
   6:4 49:5
stated 54:8
States 1:1 5:6
stenographer
   10:3
stenographic
   65:13 68:1
   70:1 72:5
Stephanie 2:14
   5:23 6:22 7:2
   69:13 70:16
stipulate 6:10,17
   7:18
stipulations
   7:20
stones 42:2
stopped 56:21

Street 1:23 2:4,9
   2:15 3:10
stuck 41:2
stuff 41:4 42:15
   60:6 64:21
stunned 12:15
style 51:4
subject 57:18
submitted 33:20
   34:4
Subpoena 4:11
   11:12 15:20
   18:7,16 29:17
Suite 1:23 2:4
   3:16
Sunoco 2:19,19
   5:24 6:2 24:14
   24:14,16 53:14
   53:14,23,24
   55:13
supervise 52:4
supervising
   51:22 52:2
supervision
   54:21 72:19
supporters
   63:24
sure 15:1 32:18
   34:17 35:4
   42:14,19 43:6
   52:7 58:3
   59:10,14 60:3
   60:9 65:2
surfaced 64:19
surfing 40:10
surprised 12:17
Susan 1:14 6:7
   9:20 50:17
   70:9 72:11
swear 6:9,12
swore 10:22
sworn 4:4 8:1
   ——————
         T

T 4:8 72:1,1
take 9:15 10:15
   10:17 11:20
   23:22 24:2
   65:1
taken 1:13 65:10
   67:22 72:5
talk 12:22 13:4,7
   14:6,11 15:4
   38:23
talked 13:2 21:8
   68:6
talking 9:18
   41:11,15,19
   51:4 61:14
   68:11
talks 51:4
Task 4:13
tasking 52:18
tasks 53:5
tax 57:9
tech 15:12,14
   41:11
technologies
   28:2 46:2
technology
   58:22
tell 8:8 10:9 12:3
   13:22 14:24
   17:14 24:24
   28:13,16 31:3
   40:17 45:7,21
   58:20 60:13
   63:12
ten 8:18 15:12
tend 12:16
term 25:1
terminated
   25:19
terms 25:2,10
   30:23 31:6
   46:1
testified 8:2
testify 8:12
   11:13
testifying 10:22

testimony 65:12
66:23 67:24
72:7
text 14:9
thank 8:10
29:20 43:7
48:17
Theintercept.....
48:23
thing 11:8 41:3
58:6
things 40:24
46:4 52:16,17
53:7,19
think 8:18 10:14
19:8 29:15
31:24 32:3
40:14 41:1
50:20,21 53:10
56:18 57:14
58:14 59:23
63:22 68:14
thought 16:5
52:17
three 53:22
60:24 61:18,22
Thursday 1:10
1:14 72:6
TigerSwan 3:13
4:13 5:20 13:7
13:24 17:21,22
18:5,19 19:15
19:19 20:12,15
20:17,19 21:8
21:15 22:22
23:2,7,9,15,17
24:1,24 25:5
26:4,15 27:18
33:5,15 34:10
34:16 35:13,22
35:22 36:5,8
37:6 38:20
49:2,12 52:1
53:13 54:4,19
55:14 56:3,15
56:22 66:20,23

67:2
Tigerswan's
17:16 21:22
36:1
TigerSwan-iss...
18:20,24
TigerSwan.com
19:24 21:1
time 5:8,9 6:15
8:19 10:15
11:21 14:8
17:15 19:22
21:21,24 22:5
22:21 23:24
24:3 25:16
30:13 34:6,24
38:11,12 39:15
41:14,18 42:6
42:8,21 49:24
51:10 55:14
56:6 57:1
58:21 65:8,17
67:20 68:4
69:22 70:21
times 14:6
title 30:22 49:6
today 6:7 7:16
8:10 9:12,15
10:3,23 14:1
14:22 15:5
41:19 66:13
67:6
Today's 5:7
told 9:8
tools 26:5,6
top 19:14,15
61:1
track 60:7
transcribed
10:22
transcript 1:16
7:23 11:3 70:5
72:7,16
Transfer 1:6
2:18 5:12,24
6:2 24:13

53:14,23 55:6
55:13 68:19
69:14
Trooper 3:7,7,7
trying 13:12
23:16 29:4
32:9 34:3,18
41:6,6,24 42:1
57:24
twice 14:8
Twitter 42:18
two 19:18 37:10
37:12 49:3
58:17
type 27:21
typically 41:16

**U**
uh-huh 10:1
62:22
uh-uh 10:2
underneath 55:5
understand 10:7
10:9,24 11:5
23:21 31:24
39:21 40:13
54:14 61:14
66:10
understanding
17:14 31:5
understood
10:11,13
United 1:1 5:6
Unity 45:1,2
unquote 58:18
URL 39:23
48:19
use 17:20 25:1
26:7,10 42:12
user 19:6,10
40:9,16
Usual 7:19
usually 9:19
16:23
utilize 26:3

**V**
Vaguely 24:7
vandalism 49:4
varied 45:23
variety 26:5
30:24 49:17
Various 4:15
ventures 22:12
verbalize 9:22
10:1
versus 5:11 54:3
video 1:12 5:5
27:24 44:1,11
46:14,18,21,24
47:2,9,11,12
47:16,20 50:11
50:14,19 51:8
62:16,21 65:13
68:1 69:19
videographer
5:3
videos 44:7,12
44:14,15,18
48:10
videotaped 1:13
10:21 70:24
virtual 1:12 46:2
46:3
virtually 5:10
Visual 3:22
voice 8:9 10:8
volunteer 52:22
52:23
VS- 1:5

**W**
walk 45:6
walks 53:4
WALLACE
2:14
want 29:12
32:18 42:2
45:8 48:10,20
57:16
wanted 14:12
wasn't 35:6

51:20,20 53:3
54:12 56:23
watch 51:8
watching 51:21
water 61:7
way 9:19 35:23
50:24 51:6
60:23 61:16
62:23
we'll 7:1 10:14
we're 15:13 42:4
61:15 68:3
we've 41:14,18
web 27:24 28:1
40:9 46:1
website 39:5
40:7,16 46:7
50:2,8,11
60:17
Weiss-Calhoon
3:22 5:1,2 6:6
65:7,15 67:19
68:3 69:18
went 12:19
38:20 40:16
64:15
weren't 51:21
whatnot 46:5
WhatsApp 26:1
26:3
wheelbarrow
52:24
White 50:6 51:5
63:24
wife 13:2
WILLIAMS 2:3
witness 4:2,4,20
5:21 6:10 7:15
7:22 40:21
42:8 49:16
52:14 53:18
54:8 55:3 69:5
69:7 72:8
Wolfe 1:22 6:8
word 10:1 51:17
WordPress 40:7

41:1
**WordPress.com**
50:4
**words** 50:7
60:18
**work** 12:16
17:10 21:22
23:6,9,12,18
23:22 24:1
26:3,7,15 27:8
27:20 28:14,17
33:9,13,15
35:21 41:20,23
41:24 42:5,9
42:13 45:22
49:8,17 52:2,8
52:10 53:4
54:9 55:12
56:6,15 57:2
57:19,19 68:20
**worked** 17:8,19
18:23,24 22:17
33:6 49:22
61:17 68:8,8
**working** 17:15
18:19 22:11
33:5 34:15
39:3 41:15
49:18 52:15
54:5 56:8
59:12,13,15,21
61:20
**workload** 51:16
**works** 46:6
**worlds** 46:3
**wouldn't** 35:22
**write** 29:4 48:10
49:6
**writing** 9:20
29:21 61:21
**written** 25:4
34:5
**wrote** 30:22

**X**
**X** 4:1,8

**Y**
**yeah** 11:6,22
17:11,18 21:10
22:4,9 23:4
29:16 31:21
32:21 41:2
42:4,14,19
45:4 47:6 48:8
50:20 51:14
57:8 58:5 59:3
59:10,11 66:11
**year** 16:18,23
22:6 24:21
45:12
**year-ish** 22:1
**years** 8:17 15:12
22:11 28:20
37:20
**yesterday** 9:9
**Young** 50:3
**Yup** 7:9

**Z**
**zoom** 1:12 7:16
9:13 12:3,3

**0**
**07** 50:4
**08** 48:24

**1**
**1** 29:9
**10:07** 1:14 5:9
**100** 2:15
**105** 63:18 64:16
**106** 63:18
**107** 63:20
**1099** 57:7
**1099s** 58:4
**11:25** 65:8
**11:32** 65:16
**11:34** 67:20
**11:36** 68:4
**11:38** 69:22
**11:39** 71:1
**12** 46:14,18

48:14 50:5
**122** 63:23
**124** 64:3
**125** 62:2,6
**1300** 2:4
**1303** 1:23
**14** 4:22
**15** 4:11
**1515** 2:4
**16** 41:15
**17** 22:8 41:15,19
56:4,9
**17-1726-YK** 1:4
**17100** 3:5
**17101** 2:16
**17108** 3:11
**17th** 25:23
**1800** 3:4
**19102** 1:23 2:4
**1938** 20:21
**1939** 19:15
**19425** 3:16
**19601** 2:10

**2**
**2** 32:5,16,20
33:10,14
**2.0** 28:1
**20** 72:13
**200** 3:16
**2016** 27:2 33:5
34:16 36:3
37:7 41:19
**2017** 16:21 17:4
17:8,16 22:8
36:3 37:7
48:24 49:10
50:4 57:7,10
58:4
**2022** 1:10,14 5:8
45:13 46:24
72:6,13
**215** 1:24 2:5
**225** 3:10
**230** 1:23
**233-6633** 3:11

**25** 4:12
**26** 48:24
**29** 4:13 29:9

**3**
**3** 33:17
**321-5500** 3:17
**360** 58:18
**3D** 46:1

**4**
**4** 50:3
**45** 50:14,18
**484** 2:10

**5**
**5** 1:10,14 72:6
**509-2715** 2:10
**557-0099** 2:5
**581-3724** 2:16
**59** 4:14
**5Facebook** 63:1
**5th** 2:9 5:8

**6**
**6** 16:17
**6:15** 50:18
**6:42** 50:21,24
**6:58** 50:22
**606** 2:9
**610** 3:17
**63** 4:15
**68** 4:22

**7**
**717** 2:16 3:5,11
**787-0388** 3:5

**8**
**8** 4:4,6
**88** 62:2,6

**9**
**922-7112** 1:24
**941** 3:16
**97** 63:3
**99** 63:3